ASSOCIATED METALS & MINERALS
CORPORATION, Plaintiff-Appellee,

v.

The M/V VISHVA SHOBHA, her en-
gines, tackle, etc., and the Shipping
Corporation of India, Ltd., Defend-
ants-Appellants.

No. 75–1726.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 17, 1975.

Decided Feb. 19, 1976.

Philip G. Meyer, Foster, Meadows &
Ballard, Detroit, Mich., for defendants-
appellants.

Robert A. Jenkins, Scholl, Jenkins,
Robinson & Stieg, Detroit, Mich., for
plaintiff-appellee.

Before EDWARDS and CELE-
BREZZE, Circuit Judges, and CECIL,
Senior Circuit Judge.

EDWARDS, Circuit Judge.

This is a libel in rem and in personam
filed under the Admiralty jurisdiction of

the United States Courts by the owner of a cargo of steel shipped from India to Chicago. Defendants are the ship M/V Vishva Shobha, and her owner The Shipping Corporation of India, Ltd. The steel was loaded in September of 1970 at Visakhapatnam, India. Enroute to New York the Vishva Shobha collided with another ship in the Atlantic Ocean and was forced to put in at and was delayed for repairs in Dakar, Senegal. When it arrived in Detroit on December 4, its Captain determined that the Seaway was about to close for the winter and proceeded to unload the cargo of steel in Detroit. The ship and her owners refused to pay· the cost of transshipment of the cargo from Detroit to Chicago. The cargo owner sued for the cost of the transshipment estimated to be $12,000.

The case was presented in the District Court on a stipulation of facts with several exhibits attached. Both parties moved for summary judgment and the District Judge in a written opinion found that defendant's ship and her owner were liable to the cargo owner for the transshipment costs. He reserved determination of the amount of the judgment pending this appeal.

The District Judge in awarding transshipment costs to plaintiff-appellee held that the act of unloading the steel at Detroit was a deviation and that it was unreasonable in that it was motivated entirely by the one-sided economic interest of the ship and her owner in not having her risk being laid up in the Great Lakes for the winter months as a result of the closing of the Seaway.

As a second basis for his decision the District Judge also rejected appellants' reliance upon Clause 29 and relied upon Clause 16 of the Bill of Lading (both as quoted below). He said:

> In the second place, the liberties clauses do not unambiguously impose the cost of the Detroit-Chicago shipment on Plaintiff. Among the possibly applicable provisions is clause 16 which provides that "[t]ranshipment of cargo for ports where this ship does not call or for the Carrier's purposes, to be at the Carrier's expense." The

ambiguity of the liberties clauses would have to be construed against the carrier, who drafted them (in nearly microscopic print). *Chrysler Corporation v. Hanover Insurance Company,* 350 F.2d 652 (7th Cir. 1965), [*cert. denied,* 383 U.S. 906, 86 S.Ct. 890, 15 L.Ed.2d 664 (1966)].

Appellant denies that the unloading in Detroit was a deviation but also contends that if it be held such, it was reasonable, and in any event, did no injury to the cargo.

Appellant also depends upon the language of Clause 29 of the Bill of Lading entitled "Quarantine" which reads as follows:

> 29. QUARANTINE: In any situation wheresoever or whatsoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the reasonable judgment of the Carrier or Master likely to give rise to risk of capture, seizure, detention quarantine, damage, delay or disadvantage to or loss of the ship or any part of her cargo or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter or discharge the goods at the port of discharge or to give rise to delay or difficulty in arriving, discharging remaining at or in leaving the port of discharge or the usual place of discharge in such port the Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or, attempting to discharge the goods there, may, without giving any prior notice, discharge the goods into depot, lazaretto, craft or other place, or the master may retain the goods on board until the return trip or until such time as he or the Carrier thinks advisable without additional freight or the master may whether on the return trip or before, proceed or return, directly or indirectly to or stop at such other port or place whatsoever as he or the Carrier may consider safe or advisable under the circumstances, and

discharge the goods or any part thereof into depot, lazaretto, craft or other places there without giving any prior notice. In any such case the goods when so discharged as hereinabove [sic] provided, shall be at their own risk and expenses and such discharge shall constitute due delivery thereof by the Carrier under this Bill of Lading and the Carrier shall be freed from any further responsibility in respect thereof. The Master or Carrier acting as forwarding agents only may and shall wherever reasonably practicable, forward the goods so discharged by any means by water or by air or by land, or by combination of such means, at the risk of the goods, but in such case the expense of transhipping or landing and forwarding other than such items thereof as are recoverable in General Average, shall be borne by the shipper or consignee of the goods.

Appellee, of course, argues that, as the District Judge found, the unloading of the steel at Detroit was a deviation which was not "reasonable" within the meaning of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(4) (1970).

Plaintiff-appellee also argues that this case is controlled by Clause 16 of the Bill of Lading (an exhibit in the District Court record) entitled "Transhipment" which (with plaintiff's emphasized language underlined) is printed as follows:

16. TRANSHIPMENT: The carrier has a liberty to carry the goods by the above or other steamships or vessels belonging to themselves or others by any route direct or indirect and at ship's option and expense but at consignee's risk to tranship at any place or places to any other vessels, or to land or store or put into hulk, craft or lighter, to re-ship in the same or other vessel proceeding by any route or forward by lighter, rail or any other conveyance whether such other vessel, store, hulk craft, lighter or other conveyance belonging to the shipowners or not with liberty also to overcarry the goods beyond or away from their port of destination notwithstanding the arrival of carrying steamer at such port. Goods so overcarried or carried away from the destination and goods in course of transhipment may be placed or stored in craft or ashore and re-shipped or forwarded or returned by land or sea at the Carrier's option and expense but at consignee's risk. The carrier to be free of liability for any loss, depreciation or damage arising from overcarriage or return carriage or for loss or market. In the event of the goods being consigned to any port or place to which the steamer cannot enter the next tide after having arrived as near as one can safely get thereto [sic] without discharging and be always afloat the master shall be at liberty to discharge the' whole or any part of the cargo into lighter at consignee risk. In cases where this ultimate destination at which the Carrier may have engaged to deliver the goods is other than the steamer's port of discharge the Carrier reserves the right to forward such goods by rail. Goods forwarded by rail are deliverable at any railway station within or nearest to the destination named and must be taken away by the consignees immediately after arrival otherwise the Consignees will be liable for any expenses incurred. Whenever through Bills of Lading are granted by the Carrier and shipment transhipment carriage or delivery of the goods is to be performed or partly performed by the vessels or Agents or servants of the other shipowners such shipment transhipment carriage of [sic] delivery is to be subject to the conditions and exceptions of the forwarding conveyance supplemented by those expressed herein and at consignee's risk. Transhipment of cargo for ports where this ship does not call or for the Carrier's purposes, to be at the Carrier's expense, but at consignee's risk from the time the goods are lifted from and leave the ship's deck, where the Carrier's responsibility shall cease. Goods to be forwarded as soon as practicable, but the Carrier does not guarantee that steamer shall have room at the Port of transhipment and accept no liability for detention, any expenses

for storing or warehousing to be borne by the consignee. For dutiable cargo transhipped, shipowners may give such undertaking as Customs require at port of transhipment respecting dealing with cargo at port where duty is payable and all charges and risks incurred shall be on account of the consignees.

\* \* \* \* \* \*

On appeal the parties argue all of the above issues which were likewise presented to the District Judge. In addition plaintiff-appellee asserts that the "fault" of the Vishva Shobha in the collision which delayed her arrival should also be taken into account in determining the reasonableness of her captain's decision to transship the steel. Finally, before us appellant emphasizes that no damage to the cargo itself resulted from its being transshipped and presumably that even if an unreasonable deviation were to be found, transshipment costs would not be covered.

As background for our decision, we adopt the District Judge's summary of the stipulated facts as follows:

Defendants issued bills of lading obligating it [sic] to ship a cargo of steel from Visakhapatnam, India to Chicago, Illinois aboard the motor vessel VISHVA SHOBHA. Plaintiff holds the bills of lading covering the cargo.

The steel was loaded aboard the ship in September, 1970. The ship was scheduled to arrive in Chicago in late November, 1970 after stops in various international ports.

On October 18, 1970, while the vessel was en route to New York it collided with another ship in the Atlantic Ocean. After the collision, it proceeded to the nearest port, Dakar, Senegal, for repairs so as to make the vessel seaworthy for the intended voyage. It arrived at Dakar on October 22, 1970. The repairs were completed on November 8, 1970 at which time the vessel departed Dakar for New York. It arrived in New York on November 18, 1970. It then proceeded via the St. Lawrence Seaway to Montreal, Toronto, Hamilton, Ashtabula, and arrived in Detroit on December 4, 1970.

The ship could have proceeded to Chicago but failed to do so. Instead, the steel cargo was discharged in Detroit and the ship returned outbound through the Seaway. The ship failed to proceed to Chicago because of fear of not exiting the Seaway before its closing. The official closing date of the Seaway was December 10, 1970, and the Seaway was held open on a day-to-day basis until December 18, 1970, the last vessel having cleared the Seaway on December 15, 1970. The normal voyage time from Detroit to Chicago is 2½ to 3 days. From Chicago, it normally takes 8–10 days to proceed through the Seaway.

Defendants, having unloaded the cargo in Detroit, refused to pay the transhipment cost from Detroit to Chicago. These costs were paid by Plaintiff who now sues to recover them.

In deciding this appeal we note that the parties stipulated that the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 (1970) applies. Indeed, we think that its provisions, as applied to the contract of carriage, are determinative of this litigation and require our affirmance of the decision of the District Court.

Several sentences from the stipulation of facts serve to describe the contract of carriage and the claimed violation:

At all times material plaintiff was the holder in due course of Bills of Lading Nos. 1 through 14 (and the owner of the steel cargo described therein) issued by defendant under various dates from September 3 to 6, 1970 calling for carriage of said cargo from Visakhapatnam, India to Chicago, Illinois aboard the M/V VISHVA SHOBHA.

\* \* \* \* \* \*

Cargo destined for both Detroit and Chicago was discharged at Detroit and the vessel departed Detroit outbound the seaway on December 8, 1970 without going to Chicago.

The Chicago destined cargo was discharged at Detroit at the insistence of

defendant and contrary to the demands of plaintiff who requested that defendant complete the voyage to Chicago or pay for the cost of transshipping the Chicago cargo to destination. Defendant refused both requests.

The normal voyage time from Detroit to Chicago is 2½–3 days. From Chicago, it normally takes 8–10 days to proceed through the seaway.

The VISHVA SHOBHA could have discharged her Chicago cargo at destination had she proceeded to Chicago, but failed to do so and discharged her Chicago cargo at Detroit so that she would not have to go to Chicago because of fear of not exiting the seaway before its closing.

The official closing date of the seaway was December 10, 1970 and the seaway was held open on a day to day basis until December 18, 1970, the last vessel having cleared the seaway on December 15, 1970.

■ In the Bill of Lading which constituted the contract of carriage in this case, the parties themselves agreed upon Clause 16 specifically entitled "Transhipment." The transshipment clause included these sentences: "In cases where this ultimate destination at which the Carrier may have engaged to deliver the goods is other than the steamer's port of discharge the Carrier reserves the right to forward such goods by rail. . . . Transhipment of cargo for ports where this ship does not call or for the Carrier's purposes, to be at the Carrier's expense, but at consignee's risk from the time the goods are lifted from and leave the ship's deck, where the Carrier's responsibility shall cease."

The phrase contained in Clause 16 calling for "Transhipment of cargo . . . for the Carrier's purposes . . . to be at the Carrier's expense . . ." appears to this court (as it did to the District Judge) to be directly applicable to the fact situation set forth above. The stipulated facts show that the Captain's decision to "discharge her Chicago

cargo at Detroit" was "because of fear of not *exiting the Seaway* before its closing." (Emphasis added). There are no facts in this case to indicate any concern about the ship's ability to proceed to Chicago and there safely to discharge the cargo of steel. Thus the facts fully support the District Judge's conclusion that Clause 16 applies. The transshipment was in the language of Clause 16 "for the Carrier's purposes" and should therefore be "at the Carrier's expense."

In reaching this conclusion we have by no means ignored defendants-appellants' contention that other clauses in the Bill of Lading—particularly Clause 29 entitled "Quarantine"—entitled the ship's captain to discharge this cargo in Detroit and to refuse to pay the costs of rail shipment to its proper port of discharge. There is indeed language in Clause 29 (and other clauses)[1] of such a general nature that, if given full effect, would give absolute discretion to the captain to discharge cargo at any place and any time without prior notice and at the risk and expense of the shipper or consignee.

■ As to this argument we note initially that Clause 16 entitled "Transhipment" is much more specifically applicable to the present situation than any of the clauses relied upon by appellants. Moreover, we agree with the District Judge that if Clause 29 (or any of the other clauses cited) be regarded as conflicting with Clause 16 and thus as occasioning an ambiguity in the Bill of Lading, such ambiguity should properly be resolved against the party (here the defendant ship owner) which prepared the instrument. *Chrysler Corporation v. Hanover Insurance Co.,* 350 F.2d 652 (7th Cir. 1965), *cert. denied,* 383 U.S. 906, 86 S.Ct. 890, 15 L.Ed.2d 664 (1966).

Of even greater weight in this Admiralty case, however, are two specific clauses set forth in the Carriage of Goods by Sea Act, *supra.* This Act (COGSA) was the product of extensive legislative activity by the shipping industry and was designed to alter prior Ad-

---

1. These provisions appear to us to be examples of the "absurdly wide voyage clauses" criticized in Gilmore & Black, The Law of Admiralty 182 (1975).

miralty law which had tended to make common carriers by sea insurers of the safe carriage of cargo. *See The Propeller Niagara v. Cordes,* 21 How 7, 62 U.S. 7, 23 (1858). COGSA controls Bills of Lading and similar documents evidencing contracts for carriage of goods by sea to or from ports of the United States in foreign trade. 46 U.S.C. § 1300 (1970). Many of its provisions are distinctly designed to protect the economic interests of the shipping industry against claims from cargo shippers. *See* 46 U.S.C. § 1304(1), (2) and (5) (1970).

It is also apparent, however, that Congress was aware of the extent of its favors to the shipping industry and intended to restrict it from additional self-help:

> (8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

46 U.S.C. § 1303(8) (1970).

One of the duties and obligations set forth in COGSA is 46 U.S.C. § 1303(2) which reads: *"The carrier shall properly and carefully* load, handle, stow, *carry,* keep, care for, *and discharge the goods carried."* (Emphasis added.)[2]

These provisions of COGSA serve to render invalid those portions of Clause 29 which may be read as exempting the ship from any and all liability for failure "properly" to discharge the goods carried at the port of discharge specified in the Bill of Lading.

Clause 16, "Transhipment," is not, however, affected by any such statutory

bar. Recognizing the generally superior bargaining power of the common carrier compared to the shipper, Congress specifically provided that the carrier could surrender any of its rights and immunities and could increase its liabilities by voluntarily encompassing such provisions in the Bill of Lading:

> A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter, provided such surrender or increase shall be embodied in the bill of lading issued to the shipper.

46 U.S.C. § 1305 (1970).

Section 1305 validates the terms of Clause 16 requiring the carrier to pay transshipment expenses. Clause 16 is the contract provision, agreed upon between the parties when the Bills of Lading were executed, which controls this case. All of the other issues detailed above (interesting and important as they may be) are irrelevant to our appellate function, since no matter how they are decided, the result is still controlled by Clause 16.

The decision of the District Judge is affirmed for the reasons stated above and the case is remanded for proofs as to the amount of judgment to be entered.

---

**2.** Concerning the duty imposed by this section, Gilmore & Black say:

> That duty, by the terms of the Act, overrides every contractual stipulation, whether in the form of a voyage clause or otherwise, and permeates every phase of the performance of the contract of carriage. For losses *causally connected* with the breach of that duty the carrier is liable, regardless of any clause of any name or type, and, indeed, without even any reference to the notion of deviation. Gilmore & Black, The Law of Admiralty 182 (1975).

This would suggest carrier liability even without Clause 16.