**SHONAC CORPORATION, Plaintiff,**

v.

**MAERSK, INC., et al., Defendants.**

No. C2–99–870.

United States District Court,
S.D. Ohio,
Eastern Division.

March 30, 2001.

Juan Jose Gonzales Perez, Perez & Morris, Columbus, OH, for plaintiff.

John Patrick Gartland, Vorys Sater Seymour & Pease, Columbus, OH, Marc S. Blubaugh, Benesch Friedlander Coplan & Aronoff, Columbus, OH, Jeffrey A. Healy, Arter & Hadden, Cleveland, OH, Eric Larson Zalud, Benesch Friedlander Coplan & Aronoff, Cincinnati, OH, for defendant.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Motion for Partial Summary Judgment filed by the Defendant and Third Party Plaintiff Fritz Companies, Inc.'s ("Fritz"). (Doc. # 39). Plaintiff Shonac Corporation contracted with Fritz for the delivery of leather shoes from Brazil, where the shoes were manufactured, to Columbus, Ohio, where Shonac is located. Fritz subcontracted with the other Defendants to assist in this delivery. The container in which the shoes were to have been shipped was empty at the time it arrived in Columbus. Shonac brings this suit to recover its damages. Fritz now seeks a partial judgment to establish that, in the event that Fritz is found liable, Shonac cannot recover its lost profits and certain marketing, administration, and processing costs. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Fritz's Motion.

## I. BACKGROUND.[1]

Shonac is an Ohio corporation with its principle place of business in Franklin

1. The relevant background facts are not disputed by the parties.

County, Ohio. In the summer of 1998, Shonac purchased 4,650 pairs of men's leather shoes (the "shoes") from Rada & Paula LTDA., a Brazilian company ("Rada & Paula"). The shoes were packaged in 475 cartons and put in a container to be delivered to Columbus, Ohio.

To transport the shoes, Shonac hired Fritz, which in turn contracted with various other entities to transport the shoes to Columbus, including Defendant Maersk, Inc. ("Maersk"). Both Fritz and Maersk issued bills of lading in connection with the shoes. Fritz issued a through bill of lading "STSMIA # 070092" dated July 18, 1998. (Doc. # 60, Exh. A). Similarly, Maersk issued a bill of lading "AEUNVM 008362" also dated July 18, 1998. (Doc. # 60, Exh. B). The shoes were purportedly transported in a sealed container "TRLU609730–1" (the "Container").

After Rada & Paula manufactured the shoes, and while under Fritz's care and control, the shoes were taken from Rada & Paula's factory in Brazil to two Brazilian carriers, Radial Transportes, S.A. and Fama Santista Transportes Amazena Gerain Terminal Ltda. and delivered to Maersk in Santos, Brazil. Maersk, by ocean liner, brought the Container to New Jersey, where it was delivered to Consolidated Rail Corporation ("Conrail"). Thereafter, Conrail, via rail, brought the Container to Columbus, where Freedom Transport, Inc., an Ohio corporation, picked it up. On or about August 11, 1998, Freedom Transport delivered the Container to Shonac in Columbus, Ohio. On August 12, 1998, Shonac employees broke the seal and found that the Container was empty. This lawsuit followed.

On January 6, 2000, the Court held a preliminary pretrial conference and the Court ordered Shonac to serve an itemized settlement demand upon the other parties by January 28, 2000. (Doc. # 33). On January 28, 2000, Shonac served a settlement demand upon the parties seeking $179,095.91. Among other damages, Shonac's settlement demand included a claim for $41,568.70 in "lost profits" and a claim for $51,159.00 in "marketing, administration, and processing costs." Fritz filed this Motion for Partial Summary Judgment in order to obtain a ruling that Shonac may not recover for these alleged damages.

## II. STANDARD FOR SUMMARY JUDGMENT.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III. ANALYSIS.

### A. Fritz's Motion is not Premised on Evidence Protected by Rule 408 of the Federal Rules of Evidence.

Shonac argues that Fritz's Motion for Partial Summary Judgment should be de-nied because it is based on Shonac's settlement demand required by the Court's Order and protected by Rule 408 of the Federal Rules of Evidence ("Rule 408"). According to Shonac, allowing Fritz's Motion would undermine the pro-settlement policy underlying Rule 408. In response, Fritz argues that the Shonac's settlement demand is unnecessary to Fritz's Motion because: (1) Shonac disclosed all documents attached to the settlement demand during discovery and (2) the Court need not rely on any particular statement by Shonac in order to rule that certain types of damages are not recoverable. In addition, Fritz argues that the pro-settlement policy underlying Rule 408 is not jeopardized by its Motion.

Rule 408 provides in pertinent parts as follows:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

Fed.R.Evid. 408. Thus, evidence of compromise is inadmissible to dispute the amount of a claim unless the evidence is "otherwise discoverable."

In this case, Fritz relies on only two documents containing Shonac's settlement demand. Each of these two documents had already been produced in response to Fritz's discovery requests. First, Fritz relied on Shonac's invoice indicating the price that Shonac paid for the shoes in question in order to illustrate the

loss profits being sought by Shonac. This invoice was produced in connection with Fritz's discovery request. (*See* Doc. # 44, Exh. A). In addition, Shonac disclosed in its Complaint that it sought the retail value of the shoes. (*See* Doc. # 1, at ¶¶ 5, 15). Second, Fritz relied on a document containing a reference to marketing, administration and processing costs. This document was also produced in connection with Fritz's discovery requests. (*See* Doc. # 44, Exh. B). Consequently, the Court concludes that Fritz's Motion is not barred by Rule 408 because, although it refers to Shonac's settlement demand, the settlement demand itself is not necessary to Fritz's Motion and the pertinent documents and information were otherwise discoverable. *See Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir.1981)(stating that the "otherwise discoverable" language in Rule 408 "was intended to prevent one from being able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation.")

This conclusion is supported by the fact that Shonac does not allege that the figures stated in the settlement demand were in any way reduced from its actual damages in an effort to achieve a settlement. Indeed, although Shonac sought $179,095.91 in its settlement demand, it has now presented evidence that its actual damages were $160,825.72. Thus, allowing Fritz's Motion to go forward would not offend the pro-settlement policy in this case because there is no reasonable way to infer that the settlement evidence is an admission of the invalidity or the amount of the claim. For these reasons, the Court rejects Shonac's arguments based on Rule 408.

### B. Shonac's Entitlement to Lost Profits.

Fritz argues that Shonac may not recover lost profits as damages for four reasons.

First, Fritz argues that Shonac's claim for recovery of lost profits is barred under Ohio law by the plain language of the two bills of lading which imposes limits on Fritz's liability. Second, Fritz argues that it is not a carrier subject to the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1300 *et seq.* ("COGSA"), which Shonac asserts prohibits limitations of liability clauses. Third, Fritz argues that even if COGSA applies, Shonac's claim for recovery of lost profits is barred under federal law because COGSA prohibits a purchaser of fungible goods in bulk from recovering lost profits. And fourth, Fritz argues that Shonac's claim for recovery of lost profits is barred on the grounds that Shonac's lost profits are speculative and Shonac breached its obligation to mitigate damages.

Shonac makes four arguments in response. First, Shonac argues that the contract does not contain words of limitation as asserted by Fritz. Second, Shonac argues that COGSA controls this action and that limitation of liability provisions are prohibited by COGSA. Third, Shonac argues that it may recover lost profits under COGSA. Fourth, Shonac argues that its claim for lost profits is not speculative.

### 1. Limitation of Liability.

Fritz argues that Shonac is not entitled to recover its lost profits based on the bill of ladings' limitations of liability. (Doc. # 39 at 7). The clause in the bill of lading issued by Fritz states in pertinent part as follows: "when *the Carrier* is liable for compensation in respect of loss of damage to the goods, such compensation shall be calculated by reference to the invoice value of the Goods, plus freight charges and insurance if paid." (Doc. # 60 at Exh. A, ¶ 6.3)(emphasis added). In addition, Fritz relies on another provision of the bill of lading which provides in pertinent part as

follows: "the *Carrier* shall in no circumstances be liable for direct or indirect or consequential loss or damages and the defences [sic] and limits of liability provided for herein shall apply in any action against the Carrier whether it be founded on contract or in tort." (*Id.* ¶ 6.8)(emphasis added). Fritz argues that under Ohio law, these provisions expressly preclude Shonac from recovering lost profits because liability is "calculated by reference to the invoice value" and shall not include "direct or indirect consequential loss or damages."

These clauses expressly purport to limit liability for a "Carrier." Thus, Fritz must be a "carrier" for these clauses to apply. However, in order to establish that COGSA does not apply, Fritz argues that it is not a carrier. Thus, the Court must determine whether Shonac is a carrier. If Fritz is a "carrier" under COGSA, then COGSA rather than state law controls this action and COGSA prohibits these limitation of liability clauses.[2]

### 2. Fritz is a "Carrier" and COGSA Applies.

■ Fritz argues that it is not a carrier but a freight forwarder.[3] Under COGSA, a freight forwarder is liable for lost goods only if its own negligence (including negligence in hiring a carrier) caused the loss. *See, e.g., Royal Ins. Co. v. Fountain Techs.*, 984 F.Supp. 724, 729 (S.D.N.Y. 1997). But, "a forwarder who contracts to deliver the goods to their destination, as well as or instead of arranging for their transportation, becomes liable as a common carrier for loss or damages to the goods, whether the fault or other basis for liability for damages lies with the forwarders or with the underlying carrier actually transporting the goods." *See Zima Corp. v. M.V. Roman Pazinski*, 493 F.Supp. 268, 274 (S.D.N.Y.1980).

Fritz asserts that no bill of lading indicates that it is a carrier or that Fritz contracted to deliver goods. In addition, Fritz asserts that the bill of lading it issued refers to it as the shipper and as the agent for Third–Party Defendant Rada & Paula, Ltd. According to Fritz, the bill of lading discloses Maersk as the carrier. Fritz also points out that on Maersk's bill of lading, Fritz is listed as the shipper and the consignee. Last, Fritz points out that it has always maintained that it was a freight forwarder.

Shonac, on the other hand, argues that Fritz is a carrier. According to Shonac, the bill of lading executed by Fritz demonstrates Fritz is a carrier because Fritz executed it as a "carrier" and because it establishes Fritz's duties as the duties of a carrier. Second, Shonac argues that Fritz satisfies the plain meaning of the statutory definition of carrier because it issued a bill of lading. Third, Shonac argues that Fritz qualifies as a carrier under a four factor test commonly applied by courts to distinguish between carriers and freight forwarders. The Court agrees with Shonac.

COGSA defines a "carrier" as "the owner or charterer who enters into a contract

---

**2.** Although Fritz initially argues that the "saving to suitors" clause contained in 28 U.S.C. § 1333 requires the Court to apply state common law to this action (Doc. # 39 at 5–6), Fritz also admits that to the extent that it is a "carrier" COGSA preempts common law remedies. (*See id.* at 9); *see also Expeditors Int'l. of Washington, Inc. v. Crowley Am. Transp., Inc.*, 117 F.Supp.2d 663 (S.D.Oh. 2000)(J. King)("when COGSA is applicable, no remedy exists under state law or general

maritime law for breach of contract, negligence, or conversion.")

**3.** Freight forwarders "in essence, act as export departments for their shipping clients in securing cargo space on a vessel, advising on licensing and letter of credit terms, getting the shipment to the dock on time, clearing customs, etc." *Zima Corp. v. M.V. Roman Pazinski*, 493 F.Supp. 268, 272 (S.D.N.Y. 1980) (internal quotations omitted).

of carriage with a shipper." 46 U.S.C.App. § 1301(a). The Act also states that "the term 'contract of carriage' applies only to contracts covered by a bill of lading or any similar document of title, insofar as such documents relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment such bill of lading or similar document regulates the relations between a carrier and holder of the same." 46 U.S.C.App. § 1301(b).

No court in this circuit has applied this statutory language to distinguish between a freight forwarder and a carrier. Nonetheless, at least two approaches have been developed by courts outside of this circuit. Both of these approaches favor treating Fritz as a carrier under COGSA.

The Fifth Circuit follows COGSA's plain language focusing on whether a party entered into a contract for carriage with a shipper. *See Sabah Shipyard SDN BHD v. M/V Harbel Tapper*, 178 F.3d 400, 405 (5th Cir.1999). In *Sabah*, the Fifth Circuit concluded that the defendants had, "without question" entered into a contract for carriage because they had agreed to carry Sabah's goods by sea and issued bills of lading. *Id.* The bill of lading issued by one defendant provided for shipment aboard a ship owned by another defendant.

■ Applying the Fifth Circuit standard to this case, the Court concludes that Fritz is a carrier. There is no dispute that the bill of lading issued by Fritz was a contract to carry Shonac's goods by sea. (*See* Doc. # 39 at 10–11). *Cf. Associated Metals & Minerals Corp. v. The M/V Vishva Shobha*, 530 F.2d 714, 718 (6th Cir.1976)(treating a bill of lading as a contract for carriage). Indeed, the bill of lading expressly states

> as far as this Bill of Lading covers the carriage of Goods by water either by the Carrier or any underlying carrier the contract *evidenced by the Bill of Lading* shall have effect subject to the ... Carriage of Goods by Sea Act.

(Doc. # 60, Exh. A, ¶ 5(a)) (emphasis added). Moreover, as in *Sabah*, the fact that Fritz may have hired third parties to actually carry the goods, such as Maersk, is not dispositive.

The second approach to determining whether a party is a carrier or a freight forwarder involves the application of four factors:

> (1) the way the party's obligation is expressed in documents pertaining to the agreement, although the party's self-description is not always controlling; [citations omitted] (2) the history of dealings between the parties; [citation omitted] (3) issuance of a bill lading, although the fact that a party issues a document entitled "bill of lading" is not itself determinative; [citations omitted] (4) how the party made its profit, in particular, whether the party acted as agent of the shipper ... procuring the transportation by carrier and handling the details of shipment for fees which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation. [citations and quotations omitted].

*Zima*, 493 F.Supp. at 273. Applying these factors to this case the Court concludes that Fritz is a carrier for the purposes of COGSA.

The parties address only two of these factors. The Court concludes that both factors weigh in favor of treating Fritz as a carrier. The fact that Fritz issued a bill of lading weighs in favor of treating Fritz as a carrier and not a freight forwarder. Further, the expression of the party's obligation in the documents, although not clear cut, also weighs in favor of treating Fritz as a carrier.

■ The bill of lading is arguably ambiguous as to whether Fritz is a "Carrier"

or a "Shipper." Before discussing the terms of the bill of lading, the Court notes that any ambiguity in the bill of lading should be resolved against Fritz as the issuer of the bill of lading. *See, e.g., All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1431 (9th Cir.1993); *Garnay, Inc. v. M/V Lindo Maersk,* 816 F.Supp. 888, 893 (S.D.N.Y.1993). On the face of the bill of lading, in the lower left corner of the document, Fritz executed the bill of lading as the "Carrier."[4] However, Fritz is described as a "shipper/exporter" in the upper right hand corner of the document. As between these two indications of Fritz's capacity, the Court weighs the "Carrier" language more heavily as that is the capacity in which Fritz executed the bill of lading, as indicated by the signature appearing below the "Carrier" term.

In addition, the front side of the bill of lading expressly limits Fritz's liability to $500 per package and provides the "Shipper" an opportunity to declare a higher value. This clause is based on the express provisions of COGSA which allow for such limits of liability for "carriers." *See* 46 U.S.C.App. § 1304(5). Thus, the clause not only provides evidence that the parties intended COGSA to apply to the bill of lading, but also, it shows that the parties treated Fritz as a "carrier" in expressing its obligations.

Furthermore, on the reverse side of the bill of lading, "Carrier" is defined as the "party on whose behalf the Bill of Lading has been issued as indicated on the face

hereof."[5] (Doc. # 60, Exh. A at § 1.0) As stated earlier, the bill of lading was executed on behalf of Fritz, as the "Carrier." The "Conditions" of the bill of lading describe the obligations of the Carrier in great detail, including the very limitations of liability on which Fritz seeks to rely here. (*Id.* at §§ 4, 5, 6, etc.) The Court concludes that this language indicates that the parties treated Fritz as a carrier in expressing its obligations under the bill of lading.

For all these reasons, the Court concludes that Fritz is a carrier for the purposes of determining its liability under COGSA.

**3. COGSA Precludes Limitations of Liability.**

■ Having concluded that Fritz is a "carrier" and that COGSA applies to determine Fritz's liability under the bill of lading, the Court now considers Shonac's argument that the limitation of liability clauses are null and void under COGSA. Fritz's sole retort to this argument is that COGSA does not apply because Fritz is not a carrier. Under Fritz's interpretation of the clauses, Fritz's liability is limited to the invoice value of the shoes plus shipping and insurance costs. Assuming this interpretation to be correct, the Court agrees with Shonac that these provisions violate COGSA, specifically 46 U.S.C.App. § 1303(8).[6] Section 1303(8) nullifies any provision that lessens a carrier's liability under COGSA. Under COGSA a carrier is liable for any "actual damages" its fault

---

**4.** Toward the middle of the document, third party defendant Maersk is designated as an "exporting Carrier."

**5.** In addition, "carriage" is defined as "the whole of the operation and services undertaken by the Carrier in respect of the Goods." (§ 1.0).

**6.** Section 1303(8) provides in pertinent part as follows:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void.

46 U.S.C.App. § 1303(8).

causes a shipper. 46 U.S.C.App. § 1304(5). As discussed in detail below, because actual damages could include lost profits and therefore exceed invoice value plus insurance and shipping costs, the provisions in question, as interpreted by Fritz, lessen Fritz's liability under COGSA. It follows that the provisions are null and void. *See, e.g., Otis McAllister & Co. v. Skibs,* 260 F.2d 181 (9th Cir.1958)(holding that provision of bill of lading to the effect that actual value shall be an amount equal to shipper's invoice value, plus freight, insurance, and duties, thus lessening the liability of a carrier for negligence below the shipper's actual damages was null and void and of no effect under section of COGSA); *Associated Metals & Minerals Corp. v. The M/V Vishva Shobha,* 530 F.2d 714, 719 (6th Cir.1976)(reading 1303(b) to invalidate provisions in a bill of lading that lessened carrier's liability); *Holden v. S/S Kendall Fish,* 262 F.Supp. 862, 864 (E.D.La.1966), *aff'd* 395 F.2d 910 (5th Cir.1968).

### 4. COGSA Permits the Recovery of Lost Profits.

COGSA states that "in no event shall the carrier be liable for more than the amount of damage actually sustained." 46 U.S.C.App. § 1304(5). Fritz asserts that lost profits do not generally constitute "actual damages" under COGSA. Therefore, Fritz asserts that the wholesale value of the shoes in question should be used to determine Shonac's "actual damages."

■ It is well settled that under COGSA the ordinary measure of the "damage actually sustained" by the shipper is the difference between the market value at destination if the shipment had arrived in good condition, and its market value in the condition that it arrived, if at all. *See, e.g., Caterpillar Overseas, S.A. v. Marine Transport Inc.,* 900 F.2d 714, 724 (4th Cir.1990). Courts have allowed the recovery of lost profits under this "fair market value" measure by accepting as evidence of the fair market value at the destination, the price at which the shipper could resell the goods had the goods been shipped. *See Neptune Orient Lines Ltd. v. Burlington Northern and Santa Fe Railway Co.,* 213 F.3d 1118, 1120–21 (9th Cir.2000); *Valerina Fashions, Inc. v. Hellman Int'l Forwarders, Inc.,* 897 F.Supp. 138, 140 (S.D.N.Y.1995); ("courts award anticipated profits [under COGSA] where the plaintiff shows satisfactorily that profits were in fact lost and were not realizable by substitution of other goods."); *Nittetsu Shoji America, Inc. v. M.V. "Crystal King",* 90 Civ.2082, 1992 WL 116430 (May 21, 1992 S.D.N.Y.)(allowing evidence that fair market value of goods included 10% mark up over invoice); *Dixie Plywood Co. v. S.S. Federal Lakes,* 404 F.Supp. 461, 465–66 (S.D.Ga.1975)(Where a consignee has contracted to resell the cargo after delivery at a higher price, it has been held that the measure of recovery of damages against the vessel is the difference between the resale price and the fair market value of the shipment had it not been damaged in transit)(citing *Samincorp v. S.S. Rivadeluna,* 276 F.Supp. 251, 257 (D.Del.).)

■ The *Neptune* case is strikingly similar to the case at hand.[7] In *Neptune,* the Ninth Circuit Court of Appeals addressed the issue of whether a shipper is entitled

7. Neptune Orient Lines Ltd. ("Neptune") brought a claim against Burlington and Santa Fe Railway Company ("Burlington") seeking indemnity and damages for the money Neptune had paid to its subrogor Nike, Inc. ("Nike"), for the loss of a container of shoes. *Neptune,* 213 F.3d at 1119. Nike had provided no notification that it would lose profits if the shipment failed to arrive. Nonetheless, Nike was unable to replace the shoes because it routinely presold 90% of the shoes it ordered and the remaining ten percent were usually sold soon after being imported. Moreover, Nike was also unable to replace the shoes because it changed its models so frequently. Consequently, Neptune paid Nike

to lost profits when a container of shoes is lost during carriage and the shipper is unable to replace the shoes. The Ninth Circuit began with the rule that when the property being shipped does not arrive at the destination the shipper is entitled to recover the fair market value of the property at the destination had it arrived safely. *Id.* at 1120. As in this case, the carrier argued that the fair market value equals the amount the shipper paid the manufacturer and does not include the shipper's anticipated lost profits. The Court rejected this argument however holding instead that:

> [r]eplacement cost is an appropriate measure of damages where the injured party could mitigate the loss by replacing the goods. Where the cargo owner is unable to replace the goods, "mere replacement costs deprive a manufacturer of expected profit ... and do not compensate him for what he would have had if the contract of delivery had been performed."

*Id.* at 1120 quoting *Polaroid Corp. v. Schuster's Express, Inc.,* 484 F.2d 349, 351 (1st Cir.1973.) Thus, a shipper may recover lost profits under COGSA provided that the shipper was unable to replace the goods in question.[8]

Fritz draws this Court's attention to a number of cases in which the courts concluded that the wholesale price of the goods in question was the most accurate measure of the damages actually sustained by the shipper. In each of those cases, however, either the shipper failed to adequately establish lost profits, the shipper purchased (or was able to purchase) replacement goods, or else the shipper did not lose any sales as a result of the carrier's breach. *See Caterpillar,* 900 F.2d at 725 (holding that the plaintiff is not entitled to lost profits on a tractor where the tractor was capable of replacement, was in fact replaced, and was delivered to plaintiff's customer who paid the sale price allowing plaintiff to realize its expected profit); *Dixie Plywood Co. v. S.S. Federal Lakes,* 404 F.Supp. 461, 466 (S.D.Ga.1975)(holding that plaintiff was not entitled to recover on the basis of the retail price because the plaintiff had contracted to resell goods for the whole sale price); *Hojgaard & Schultz A/A v. Transamerican Steamship Corp.,* 590 F.Supp. 916, 925 (S.D.N.Y.1984)(plaintiff not entitled to recover lost profits where plaintiff did not intend to resale the lost item). Other cases deny lost profits based on lost productivity as opposed to lost sales. *Hector Martinez & Co. v. Southern Pac. Transp. Co.,* 606 F.2d 106, 109 n. 7 (5th Cir.1979)(denying lost profits due to loss of use of delayed and damaged dragline).[9]

---

an amount that included Nike's lost profits on the shoes and sought recovery for this amount from Burlington. Burlington argued on summary judgment that it was not obligated to indemnify Neptune for Nike's lost profits because Nike was not entitled to recover for its lost profits under COGSA.

**8.** In addition, the Court notes that while the shipper in *Neptune* routinely presold most of the shoes it ordered, "an actual contract for resale is not even required for the plaintiff to sustain its burden of proving lost profits; rather, the aggrieved party, 'need only proffer proof tending to show its loss.'" *Sogem–Afrimet, Inc. v. M/V IKAN SELAYANG,* 951

F.Supp. 429, 443 (S.D.N.Y.1996)(quoting *Valerina Fashions,* 897 F.Supp. at 141).

**9.** One line of cases establishes that "COGSA seeks the economic realities of the loss rather than the contractual bargain." *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.,* 492 F.2d 508, 514 (5th Cir.1974) (citing *Holden v. S.S. Kendall Fish,* 395 F.2d 910, 912–913 (5th Cir.1968)). This principle was developed in and applies to circumstances where the invoice value of the goods exceeded the cost of replacing the goods in the destination market. *Holden* 395 F.2d at 912–13; *Emmco,* 492 F.2d at 514 (invoice value of the goods is sufficient evidence of market value where

Thus, none of these cases undermines the rule recognized in *Neptune* that lost profits are recoverable under COGSA when the shipper is unable to replace the goods.

■ In this case, Shonac has presented the Affidavit of Ron L. Friese, Shonac's Merchandise Controller, to show that Shonac was not able to replace the lost shoes and that Shonac lost profits as a result of the Defendants' failure to deliver the shoes. (Doc. # 42, Exh. 3). According to this evidence, Shonac, which is in the business of selling shoes on a retail basis, had tested the market for this particular product. (*Id.* at ¶¶ 4, 11). Shonac planned to sell the shoes on the retail market during the "back to school" season from August to November, during which time, fifty percent (50%) of Shonac's annual sales take place. (*Id.* at ¶ 7). The typical lead time imposed by manufacturers of this product required Shonac to order the shoes in March of 1998 in order to receive them in time to sell in August 1998. (*Id.* at ¶ 8). Because of the lead time required by the manufacturer for the shoes, it was impossible for Shonac to obtain a similar product to substitute for these particular shoes in time for the back-to-school season. In addition, Shonac was prevented from obtaining replacement shoes for the back-to-school season because Shonac did not discover that the shoes were not delivered until August, after the back-to-school season had already begun. (*Id.* at ¶ 9).

Fritz asserts that Friese's testimony is insufficient to create a genuine issue of material fact for a number of reasons. First, Fritz argues that Friese's testimony is inconsistent. Fritz points out that Friese testified that "prior to ordering the shoes," Shonac tested the market for the shoes with shoes delivered in April. However, Friese also testified that the shoes were ordered in March, before any April test could have been conducted. Therefore, Shonac argues, Friese's testimony is inconsistent and cannot serve as a basis for determining lost profits. Although the testimony presents a potential inconsistency on Shonac's motive for ordering the shoes, the inconsistency does not directly relate to the information regarding the profitability of the shoes. Rather, it only relates to why Shonac ordered the Shoes. The information Shonac gathered in April regarding the market for the Shoes is not necessarily undermined by this inconsistency and could still serve as a reasonable basis for determining Shonac's lost profits. Thus, the Court concludes that the alleged inconsistency does not render Friese's testimony insufficient for the purposes of Rule 56 on the issue of lost profits.

Fritz also asserts that leather shoes are "presumably fungible" and therefore Shonac may not recover lost profits because Shonac could have replaced the Shoes. (Doc. # 39 at 12). Fritz provides no authority holding that men's leather shoes are fungible as a matter of law. Nor does the Court conclude that the general definition of "fungible" so obviously applies to leather shoes that it is willing to embrace the presumption asserted by Fritz without some supporting authority. Indeed, the notion is contrary to the holding in *Neptune*, where the shipper was allowed to recover profits because it could not replace the shoes in question. Further, Fritz also provides no evidence to show that Shonac could have replaced the shoes in question. Consequently the Court rejects Shonac's argument that because leather shoes are

---

there is no evidence that the market value had dropped at the time the goods were to have arrived). The Court is aware of no case where this principle has been applied to circumstances as in this case, where the invoice value is lower than the value of goods in the destination market as demonstrated by the shipper's anticipated resale price.

fungible, Shonac is not entitled to lost profits.

Friese also testified as to the amount of Shonac's lost profits as a result of its lost sales. According to Friese, the shoes had a retail value of $185,953.40 and Shonac anticipated selling 85% of the Shoes at this price. (Doc. # 42, Exh. 3 at ¶ 12). Friese calculated Shonac's damages as $160,825.72 which is approximately 85% of $185,953.40.[10] This figure has three component parts: first, Shonac paid $83,785.17 for the manufacturing and shipment of the shoes. Second, based on Shonac's profit margins and the company's experience with the particular shoe, and the particular season for which the shoes were ordered, Shonac anticipated making $41,709.38 in profit. In addition, the shoes were to offset $35,331.17 of Shonac's overhead costs.

■ Fritz argues that this evidence is too speculative to support an award of lost profits. First, Fritz argues that the fundamental premise of Friese's testimony—that the retail value of the shoes was $185,953.40—was overly speculative because Friese does not explain how that value was reached. However, as Fritz points out, Shonac indicated in its discovery responses that each pair of shoes had a retail value of $39.90. Although Friese does not explain in his affidavit how he reached the $185,953.40 figure, it is plainly the result of multiplying the retail price for a pair of shoes ($39.90) by the number of pairs of shoes listed on the face of the bill of lading (4650). Thus, the Court concludes that this amount is not overly speculative.

Next, Fritz takes Friese's testimony that only 85% of the shoes sell at the retail value and argues that Shonac has failed to provide any evidence as to the price at which the remainder of the shoes will be sold. This point also fails because Shonac's calculation of its damages as $160,825.72 effectively eliminates those shoes from its recovery by calculating its damages at approximately 85% of the retail value. Although the figure Shonac seeks is not exactly 85% of the retail price, evidence of damages need not be exact but only a reasonable estimate. *See, e.g., Valerina Fashions*, 897 F.Supp. at 141 ("the amount of lost ... profits need not be definitely and absolutely proved.")

■ Last, Fritz argues that Shonac failed to mitigate its damages. The failure to mitigate damages is an affirmative defense on which the defendant bears the burden of proof. *See, e.g., Sogem–Afrimet, Inc. v. M/V IKAN SELAYANG*, 951 F.Supp. 429, 444 (S.D.N.Y.1996). Fritz has come forward with no evidence to demonstrate that Shonac could have replaced the shoes or otherwise could have mitigated its damages. Consequently, the Court rejects Fritz's argument.

**C. Lost Marketing and Processing Costs.**

Shonac also seeks to recover for $35,331.17 in Shonac's overhead for marketing, administration, processing etc. The money Shonac would have obtained from the sale of the shoes was intended to offset this amount and because Shonac was unable to sell the shoes, Shonac seeks to recover the money from Fritz. In addition, Shonac seeks to recover for the time and expense it incurred in dealing with the matter because the shoes were not delivered.

■ To analyze the Shonac's claim for overhead expenses, the Court begins from the premise that Shonac has provided sufficient evidence for summary judgment to show that, had the shoes been delivered, it would have obtained approximately $160,000 from the retail sale of those

---

**10.** The Court notes that 85% of $185,953.40 is $158,060.39.

shoes. This money would have compensated Shonac for the costs of the shoes, provided a profit to Shonac and it could have been used to offset certain overhead expenses. Fritz correctly points out that any damage award must be reduced by those costs that were avoided as a result of the failure of the shoes to be delivered. Accordingly, the Court concludes that Shonac is entitled to recover those administrative and overhead costs that it can prove to a reasonable certainty it would have offset if the shoes had arrived and/or that it incurred as a result of the failure of the shoes to arrive minus any costs it avoided as a result of the failure to delivery.

The Court concludes that Fritz has not demonstrated the absence of a genuine issue of material fact as to the damages claimed by the Plaintiff. Of course, Plaintiff must still prove entitlement to those damages at a subsequent trial.

## IV. CONCLUSION.

For the reasons herein set forth, the Court **DENIES** Fritz's Motion for Partial Summary Judgment as it relates to lost profits. Thus, the Court **GRANTS IN PART AND DENIES IN PART** Fritz's Motion as it relates to Shonac's recovery of overhead expenses such as marketing administration, processing etc.

**IT IS SO ORDERED.**