*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0067p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

FORTIS CORPORATE INSURANCE, SA,
   *Plaintiff-Appellee/Cross-Appellant,*

  *v.*

VIKEN SHIP MANAGEMENT AS,
   *Defendant-Appellant/Cross-Appellee.*

Nos. 08-4478/4479

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 04-07048—Jack Zouhary, District Judge.

Argued: October 14, 2009

Decided and Filed: March 10, 2010

Before: O'CONNOR, Associate Justice (Ret.);[*] MOORE and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Irene C. Keyse-Walker, TUCKER ELLIS & WEST LLP, Cleveland, Ohio, for Appellant. David T. Maloof, MALOOF & BROWNE & EAGAN LLC, Rye, New York, for Appellee. **ON BRIEF:** Irene C. Keyse-Walker, Susan M. Audey, Henry E. Billingsley, II, TUCKER ELLIS & WEST LLP, Cleveland, Ohio, for Appellant. David T. Maloof, MALOOF & BROWNE & EAGAN LLC, Rye, New York, for Appellee.

_____

**OPINION**

_____

  SANDRA DAY O'CONNOR, Associate Justice (Retired). This is a maritime shipping case involving a claim for rust damage to steel coils caused by exposure to seawater during a journey from Szczecin, Poland to Toledo, Ohio. The central issue in

---

  [*]The Honorable Sandra Day O'Connor, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

this appeal is whether a ship manager charged with providing a Master, officers and crew, and performing various other ship-management tasks for the shipping vessel qualifies as a "carrier" under the Carriage of Goods by Sea Act (COGSA). We agree with the district court's finding that such a manager is not a COGSA carrier, and therefore COGSA's one-year statute of limitations does not bar the underlying suit. We also reject Appellant's argument that the district court's judgment rested on clearly erroneous factual findings, and we **AFFIRM**.

## I.

Fortis Corporate Insurance insured a cargo of 176 steel coils belonging to Metallia LLC. The coils were carried from Szczecin, Poland to Toledo, Ohio aboard the M/V Inviken, a 17,313 gross ton bulk carrier. During the journey, seawater entered the cargo hold containing the steel coils and caused significant rust damage to 99 of them. Fortis, as underwriter, paid Metallia $375,000 for the damage to the steel coils. Fortis then brought a lawsuit as Metallia's subrogee, alleging negligence and breach of bailment against the Inviken's owner, Viken Lakers, along with the ship's manager, Viken Ship Management (VSM).

### *Fortis I*

This dispute has previously come before this court. *See Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214 (6th Cir. 2006). We provide a brief account of the facts giving rise to the earlier appeal because they are relevant to some of the issues presented here.

In 1998, FedNav International (a Canadian company) chartered the Inviken from Viken Lakers for a period of several years. This arrangement is referred to as a time charter; it basically allowed FedNav to use the Inviken to transport cargo on an as-needed basis for the duration of the charter period. In the time-charter agreement, Viken Lakers provided FedNav with assurances that the Inviken was fit to traverse the Great Lakes and, more specifically, that it was a suitable vessel for use in the Toledo port. In 2002, Metallia subchartered the Inviken from FedNav for the Toledo-bound voyage

transporting the cargo of steel coils at issue in this case. When the steel coils were damaged during that voyage, Fortis (as Metallia's subrogee) brought suit against Viken Lakers and VSM alleging negligence and breach of bailment.

The United States District Court for the Northern District of Ohio initially dismissed Fortis's lawsuit, finding that it lacked personal jurisdiction over Viken Lakers and VSM (Norwegian companies). The district court noted that the touchstone of personal jurisdiction is whether the defendant purposefully established "minimum contacts" in the forum state, such that it could anticipate being haled into court there. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 108–09 (1987) (plurality opinion); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In evaluating the jurisdictional arguments, the district court found that Viken Lakers and VSM were "in essence, the same company," and concluded that there was no jurisdiction because Viken Lakers and VSM had not established the necessary minimum contacts in Ohio. It reasoned that Viken Lakers derives its income from providing its ships to time-charterers, none of whom were American; it was FedNav, not Viken Lakers or VSM, that chose to use the Inviken to ship through the Toledo port. The court concluded that providing a ship to a Canadian company did not establish the necessary contacts with Ohio, even though the Canadian company made clear its intent to use the ship to carry cargo to Ohio.

Fortis appealed that judgment, and this court reversed. In finding that there was jurisdiction over Viken Lakers and VSM, a panel of this court explained:

> [D]efendants outfitted and rigged their ships to sail into the Great Lakes. Defendants confirmed in the Charter Agreement that "the vessel is suitable for Toledo." Defendants' officers testified that the vessels were rigged to travel to the Great Lakes. They entered into a long-term agreement with a charterer that made its money shipping into the Great Lakes. Not counting travel time, they earned $558,000 for the number of days spent in Ohio ports over five years. Defendants had more than sufficient notice that they might be subject to jurisdiction here . . . .

*Fortis*, 450 F.3d at 221. The case was remanded to the district court for further proceedings.

***Fortis II***

On remand, Viken Lakers and VSM moved for summary judgment on the basis that the suit was filed beyond the one-year statute of limitations provided for in COGSA, 49 Stat. 1207 (1936), (codified at 46 U.S.C. § 30701 (Notes)).  COGSA generally applies "to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade."  46 U.S.C. § 30701 (Notes § 13).  COGSA provides that "carriers" are subject to certain statutory "responsibilities and liabilities," and in turn they are provided with certain "rights and immunities," such as the one-year statute of limitations invoked by Viken Lakers and VSM.  Fortis did not dispute that the suit was brought outside of the one-year statutory period provided for in COGSA, but instead argued that COGSA did not apply to this dispute because neither Viken Lakers nor VSM were "carriers" covered by the terms of that Act.

The district court agreed with Viken Lakers that it was a "carrier" and that the suit against it was barred by the one-year statute of limitations.  However, it found that VSM was not a COGSA carrier and therefore could not invoke the one-year statute of limitations.  COGSA provides that "[t]he term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper," 46 U.S.C. § 30701 (Notes § 1(a)), and the district court found that VSM could not qualify as a carrier because it was not an owner or charterer party to the contract of carriage.  Summary judgment was granted in favor of Viken Lakers, and the claims against VSM proceeded to a bench trial.

At the bench trial, the parties stipulated that the amount of damages to the steel coils was $375,000, that it was caused by seawater entering the cargo hold where the coils were stored during the voyage, and that the seawater entered through a crack in the ship's hull.  The question at trial was whether the crew should have noticed and repaired the leak before the seawater damaged the steel coils.  Critical to answering that question, and a subject of dispute between the parties, is when the crack in the ship's hull occurred.

Immediately prior to the voyage at issue, the Inviken was used to transport cargo to Antwerp, Belgium. It remained in Antwerp for several days until October 10, 2002, when it departed for Szczecin. After the Inviken arrived in Szczecin, the steel coils at issue in this case were loaded onto the ship in cargo hold number two, and the Inviken departed Szczecin for Toledo on October 17. Immediately after the departure, the crew performed bilge soundings to check the amount of water in the ship's bilges. The depth of the bilges for hold number two was .65 meters. The initial bilge sounding in hold number two was documented in the ship's log as empty, indicating that there was no water in the bilges just after departure. Bilge soundings were then taken each morning of the voyage. The daily soundings for the number two hold during the following three days steadily increased. On October 18, the sounding indicated that the bilges were filled to .12/.35 meters (the two readings represent the port and starboard side, respectively); on October 19, it was .29/.35 meters; on October 20, it was .56/.54 meters. These readings were considerably higher than those recorded for the other cargo holds on the ship.

It was not until after the October 19 sounding of .29/.35 that the crew made a visual inspection of the number two hold. The Inviken's October 19 logbook entry indicated that crew entered the hold and conducted a visual inspection. While noting an excess of humidity in the number two hold, the logbook entry did not note any cracks or leaks and indicated that the steel coils were "still in good stowed." The next day, when the soundings indicated that the bilges were nearing their total capacity of .65 meters, the ship's logbook indicated that the crew conducted a "thorough" inspection of the number two hold and once again noted no damage and concluded that the cargo was "still in good stowed." The ship's Master ordered the bilges pumped to remove the water.

On October 21, the day after the bilges were emptied, the sounding indicated that the bilges were yet again nearing their total capacity, with a reading of .57/.53. The chief mate reported that the ship was taking on water from the starboard side. The ship's Master then inspected the number two hold and observed a crack in the hull that was

causing water to leak into the ship. The crew temporarily repaired the crack and the vessel arrived safely in Toledo on October 30. Ninety-nine steel coils sustained substantial rust damage caused by seawater entering the number two hold.

During the two-day bench trial, each side presented expert testimony. Fortis's expert opined that the crack in the hull occurred prior to October 18 and was most likely caused by a collision with a tug in Antwerp. He further testified that the high bilge soundings taken on October 18 should have put the crew on notice that something was amiss. In his view, the crew should have immediately pumped the bilges and monitored their levels closely. Had the crew properly monitored the bilges and responded sooner to the high bilge readings, he concluded that the seawater would not have reached and damaged the steel coils.

The expert for Viken Lakers and VSM posited that the hull crack did not occur until October 21 and that the crew reacted to the hull breach in a timely fashion. He theorized that the crack was probably caused while en route to Toledo by debris or especially rough waters striking the Inviken. To explain the bilge readings during the first three days of the voyage, the expert posited various other causes for the high bilge soundings. He argued that the coils had been exposed to rainwater as they were being transported and loaded onto the Inviken, and that when the rainwater escaped the coils it caused the bilge soundings to rise. He also testified that cargo sweat could have played a significant role in raising the water level in the bilges.

The district court concluded that the hull breach occurred before October 18 and that the initial bilge sounding on that day was indicative of such a breach. The court found that the only realistic explanation for the ship taking on increasingly more seawater over the first three days of the voyage was that the ship's hull was cracked at the outset of the voyage to Toledo. The court discredited the theory that cargo sweat and rainwater seeping out of the coils could have been the sources for such a large amount of water (roughly 600 gallons) nearly filling the bilges during the first few days of the journey. The court also found that the nature and location of the hull crack supported Fortis's theory that it was caused by a collision with a tug and undermined the

explanation that the crack was caused by debris or rough seas during the voyage.  The court concluded that VSM's negligence in investigating and tending to the seawater flowing into cargo hold number two was the direct cause of the rust damage to the steel coils:

> The crew should have entered and inspected the hold on October 18 or, at the latest, October 19, when the water levels in the No. 2 port and starboard bilges were .29 and .35 respectively, almost three times as much as any other hold. The failure of the crew to properly and timely investigate the rising water levels was a breach of VSM's duty of reasonable care.

*Fortis Corporate Ins. SA v. M/V Inviken*, 579 F. Supp. 2d 974, 981 (N.D. Ohio 2008).

## II.

VSM raises two principal arguments on appeal.  It first argues that, contrary to the district court's ruling, it is a COGSA carrier and is therefore entitled to invoke COGSA's one-year statute of limitations as a defense, effectively barring the suit below.  Second, it argues that the district court's finding of negligence was based on clearly erroneous factual findings.  We address both of these arguments in turn.

### A.  Is VSM a COGSA "Carrier"?

COGSA "imposes particularized duties and obligations upon, and grants stated immunities to, the 'carrier.'"  *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301 (1959).  It was drafted to address the belief that carriers used their superior bargaining power against shippers when contracting for the carriage of goods, and could often dictate the terms of bills of lading to exempt themselves from any liability. 2 Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 10–15 (3d ed. 2001).  To counteract this inequality, COGSA sets baseline liabilities for carriers.  It allows parties to contract out of its terms, but only in the direction of increasing liability for carriers; parties cannot contractually limit a carrier's liability.  46 U.S.C. § 30701 (Notes § 3(8)).

COGSA defines "carrier" as follows: "The term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper."  46 U.S.C. § 30701

(Notes § 1(a)).  VSM argues that the district court took an unduly formalistic approach to interpreting COGSA's provisions when it determined that VSM did not qualify as a carrier because it was not an owner or charterer party to the contract of carriage.  Rather than focusing on that question, VSM asks this court to endorse a practical or functional approach in determining what entities qualify as COGSA carriers.  Under this approach, the critical question is whether the entity in question performed a function traditionally carried out by a carrier even if, due to the advances in the shipping industry in the seventy-plus years since COGSA was enacted, it does not meet the traditional view of what qualifies as a carrier under the Act.  This view, VSM argues, best accords with the language of COGSA, which defines "carrier" in an open-ended fashion to *include* owners and charterers who enter into contracts of carriage, but does not expressly exclude any actor in particular.  Moreover, VSM argues the approach best effectuates COGSA's purposes in the modern-day shipping world where ship managers and owners operate "hand-in-glove," with managers often carrying out the duties traditionally belonging to ship owners.  While no circuit has endorsed this functional test, it has its supporters.  *See, e.g.*, Daniel H. Charest, *A Fresh Look at the Treatment of Vessel Managers Under COGSA*, 78 Tul. L. Rev. 885, 910 (2004) ("To exclude those that perform the duties of the carrier from the operation of the very statute designed to regulate exactly those actions is a flawed approach on its face.").

The United States Supreme Court considered and rejected an argument similar to VSM's in *Herd*, so we begin our analysis there.  In *Herd*, a shipper arranged to have certain goods transported from Baltimore, Maryland to Valencia, Spain.  359 U.S. at 298.  The owner of the ship engaged an independent stevedoring company to load the goods onto the ship.  *Ibid.*  While loading in Baltimore, the stevedores dropped a 19-ton press into the harbor, causing it extensive damage.  *Ibid.*  When the shipper brought suit, the stevedoring company argued that it was covered by the limitation-of-liability provisions in COGSA (limiting compensable damages to $500 per package) and the bill of lading's parallel clause limiting the "carrier's" liability to $500 per package.  The stevedoring company argued that its activities furthered the carrier's non-delegable obligation to load and unload goods, and that COGSA's limitation-of-liability provisions

should extend to any such agent discharging a carrier's obligations. *Id.* at 300–01; *see also* Brief for Petitioner at 11 (No. 276), 1958 WL 91704 ("'The limitation on liability of the carrier under the Carriage of Goods by Sea Act is not intended to be personal, but, unless otherwise agreed, extends to any agency by means of which the carrier performs its contract of transportation and delivery'" (quoting *A.M. Collins & Co. v. Panama R.R. Co.*, 197 F.2d 893, 897 (5th Cir. 1952))).

The Supreme Court unanimously rejected this argument. It found that COGSA's plain terms applied only to carriers, and not agents thereof. *Herd*, 359 U.S. at 301. "Respecting limitation of the amount of liability for loss of or damage to goods, [COGSA] says that 'neither the carrier nor the ship' shall be liable for more than $500 per package. It makes no reference whatever to stevedores or agents." *Ibid.* Here, the district court relied on *Herd* and a more recent case from the Fifth Circuit, *Steel Coils, Inc. v. M/V Lake Marion*, 331 F.3d 422, 436–38 (5th Cir. 2003), in rejecting VSM's argument that ship managers who carry out the duties of carriage qualify as COGSA carriers.

While *Herd* seems to foreclose the functional approach to determining who qualifies as a COGSA carrier, VSM tries to distinguish the case on two grounds. First, it argues that the "Supreme Court held in *Herd* that because the stevedoring services occurred *prior* to the inception of the tackle-to-tackle period covered by COGSA, COGSA had no application." Brief for Appellant at 29; *see* 46 U.S.C. § 30701 (Notes § 1(e) ("The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship.")). For this proposition—that *Herd* rested on the fact that the stevedores acted prior to the inception of COGSA's tackle-to-tackle coverage—VSM cites footnote three of the opinion. Brief for Appellant at 29 (citing *Herd*, 359 U.S. at 299 n.3). This is a clear misreading of *Herd*. Footnote three states only that "[t]he district judge was of the view that the casualty occurred before the press had been 'loaded on' the ship, and that therefore [COGSA] was not applicable because its effective period had not begun." Beyond describing the district court's ruling, the Supreme Court said absolutely nothing about

the timing of the stevedores' activities as falling outside the tackle-to-tackle coverage of COGSA.  Whether they actually did occur outside of COGSA's tackle-to-tackle coverage was a hotly contested issue by the litigants.  *See* Brief for Petitioner at 19 (No. 276), 1958 WL 91704; Brief for Respondent at 5–6 (No. 276), 1958 WL 91705.  The Supreme Court ruled on the broader basis that a carrier's agents simply are not covered by COGSA's terms even when they carry out the carrier's obligations.

Second, VSM attempts to distinguish *Herd* on the basis that the stevedoring company in that case did not argue that it was a COGSA carrier, as VSM does here, but instead argued that COGSA should be extended to cover the agents of carriers.  That is, the rejected argument in *Herd* was that a ship-owner's agents should be *treated as* carriers when performing the functions of a carrier, whereas VSM now argues that such agents simply *are* carriers.  *See* Brief for Appellant at 29 ("The stevedore [in *Herd*] did not argue that it was a 'carrier' under the Act.  Rather, it argued that COGSA should apply to it 'as well as' the carrier or, alternatively, it could benefit from COGSA limitations of liability as an 'agent' of the carrier." (citation omitted)).  Insofar as these two arguments can even be described as distinct, any distinction is meaningless.  The Supreme Court in *Herd* rejected the argument that agents of a carrier who perform the tasks of carriage are covered by COGSA.  For us to conclude that those same agents performing the same tasks of carriage are in fact carriers would be a clear circumvention of *Herd* and render it meaningless.   The other circuits to have considered this issue are in agreement on this point.  *See Steel Coils*, 331 F.3d at 436–37; *Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 222–23 (2d Cir. 1991).

VSM complains that, unless it is covered as a COGSA carrier, it will be subjected to all of the liabilities of a carrier with none of the protections.  This is not true; VSM is subjected to neither the liabilities nor the protections of a COGSA carrier.  For instance, COGSA utilizes a complicated burden-shifting mechanism that effectively leaves carriers liable for any damage to cargo unless they meet the affirmative burden of proving that they exercised due diligence to prevent the damage.  *See Steel Coils*, 331 F.3d at 426 (explaining COGSA's burden-shifting mechanisms).  VSM was not

subjected to that burden, or any other burden COGSA imposes upon carriers, in the district court. Instead, it was held liable for common-law negligence in managing the Inviken and, in that capacity, it was treated as a simple tortfeasor. *See Citrus Mktg. Bd.*, 943 F.2d at 222 (COGSA does not preclude claims against ship managers as tortfeasors); *Associated Metals and Minerals Corp. v. Alexander's Unity MV*, 41 F.3d 1007, 1016 (5th Cir. 1995) ("In the more than half century that COGSA has existed, no circuit has indicated that, through COGSA, Congress intended to eliminate the tort cause of action for damage to cargo. Nor does the legislative history of COGSA manifest such an intent.").

It is important to note that shipping parties are free to extend COGSA's coverage by adding provisions to bills of lading extending the COGSA regime to any and all agents or independent contractors who participate in the shipment of goods under a particular contract. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 30–31 (2004). These contractual provisions are known as "Himalaya clauses." *See generally*, Marie Healey, *Carriage of Goods by Sea: Application of the Himalaya Clause to Subdelegees of the Carrier*, 2 Mar. Law 91 (1977). If the parties in this case wanted VSM to be covered by COGSA's terms, they could have provided for that contractually, but they chose not to do so. This is especially telling when the parties were contracting against the backdrop of nearly-uniform case law refusing to extend COGSA's liabilities and immunities to ship managers absent such a Himalaya clause. The value of maintaining uniformity with our sister circuits is at a premium in cases involving the interpretation of maritime contracts, especially when the parties can easily alter the terms of their contracts to react to prevailing case law. *Cf. Kirby*, 543 U.S. at 28 (stressing need for uniformity in maritime law).

Finally, VSM argues that it is already established as the law of the case that it is a carrier, because this court and the district court treated VSM and Viken Lakers as "in essence, the same company" when evaluating the initial jurisdictional question. *See United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) ("Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for

subsequent stages of that same litigation."). Viken Lakers was found to be a carrier, and VSM argues that if it is in essence the same company as Viken Lakers, it must also be a carrier under the law of the case. This argument falters because treating two entities as equivalent for jurisdictional purposes does not somehow mean they are the same in all other ways. There are many instances where courts treat companies as the same for jurisdictional purposes, such as joint venturers, but that fact alone does not mean the companies are the same in all respects. Here, finding that VSM and Viken Lakers similarly availed themselves of the Ohio forum for jurisdictional purposes in no way precludes a finding that one is a COGSA carrier while the other is not. The law of the case doctrine "has no application where the issue in question was not previously decided." *Niemi v. NHK Spring Co.*, 543 F.3d 294, 308 (6th Cir. 2008). We find no error in the district court's conclusion that VSM was not a COGSA carrier.

### B. Was the District Court's Negligence Finding Clearly Erroneous?

The district court found that VSM was negligent when it failed to promptly pump the bilges or thoroughly investigate what was causing the influx of water in the bilges for cargo hold number two. The court found that, based on the bilge soundings, "[t]he crew should have entered and inspected the hold on October 18 or, at the latest, October 19, when the water levels in the No. 2 port and starboard bilges were .29 and .35 respectively, almost three times as much as any other hold." 579 F. Supp. 2d at 981. VSM asserts that this holding rested on clearly erroneous factual findings. In particular, VSM points out that the Inviken's logbook indicates that the crew did enter and inspect the number two hold on October 19; the logbook further indicates the crew performed a "thorough" inspection on October 20, contrary to the district court's finding that no thorough inspection occurred until October 21. VSM concludes that the district court's findings were clearly erroneous because they conflict with the ship's logbook. We disagree.

The district court did not misunderstand the logbook entries in any way. In fact, it acknowledged the entries and quoted each in its entirety. The court accurately noted that neither logbook entry described the precise nature of the inspection in any detail;

one indicated a "visual" inspection and the other noted a "thorough" inspection. The crux of the district court's ruling was that the inspections, whatever their precise nature, were clearly inadequate if they failed to reveal a crack in the hull that was in plain view and leaking a substantial amount of water. The district court rejected VSM's theory that the crack did not occur until October 21 because it found its alternative explanation for the water buildup untenable. The court credited Fortis's expert (a captain with 34-years of seagoing experience) when he concluded that cargo sweat and rainwater could not account for cargo hold number two's high bilge soundings from October 18 to October 20, especially in light of the fact that none of the other holds had such high readings. These findings—that the crack in the hull occurred before October 18 and that any competent search would have revealed the crack—were completely reasonable and adequately supported by the evidence.

VSM's counterargument seems to be that a district court is required to credit anything that appears in a ship's logbook absent overwhelming evidence to the contrary. Reply Brief for Appellant at 22 ("[L]ogbook entries are the best evidence of what happened during a voyage and 'must be accepted' as the truth unless sufficiently challenged." (citing 70 Am. Jur. 2d *Shipping* § 75 (2009)). The only source cited for this proposition does not support it. *See* 70 Am. Jur. 2d *Shipping* § 75 (2009) ("An entry made with full knowledge and opportunity of ascertaining the truth must be accepted as true *if it is against the party making it* . . . . On the other hand, the entries in the logbook shown to be materially untrue cannot be given any greater weight as evidence than the witness' statement under oath that the court considered unworthy to believe.") (emphasis added).

The district court's finding that VSM acted negligently in failing to prevent the rust damage to the steel coils was not based on clearly erroneous factual findings.

## III.

We **AFFIRM** the district court's judgment. Fortis affirmatively waived its cross-appeal in case number 08–4479 "in the event [this court] affirms the District Court's decision." Brief for Appellee at 51. Accordingly, we have no occasion to address the issues raised on cross-appeal.