RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DIMOND RIGGING COMPANY, LLC,

*Plaintiff-Appellant*,

*v.*

No. 18-3615

BDP INTERNATIONAL, INC.; LOGITRANS INTERNATIONAL, LLC,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cv-02054—Christopher A. Boyko, District Judge.

Decided and Filed:  January 25, 2019

Before:  BOGGS, KETHLEDGE, and NALBANDIAN, Circuit Judges

───────────────

### COUNSEL

───────────────

**ON BRIEF:**  Duncan H. Brown, LAW OFFICES OF DUNCAN H. BROWN, Northville, Michigan, for Appellant.  Troy B. Morris, PEREZ & MORRIS LLC, Columbus, Ohio, for Appellee BDP International.  Eric W. Beery, BEERY & SPURLOCK CO., L.P.A., Columbus, Ohio, for Appellee Logitrans.

───────────────

### OPINION

───────────────

BOGGS, Circuit Judge.  Appellant Dimond Rigging Company, LLC ("Dimond"), appeals from a district-court judgment dismissing its suit against Appellees BDP International, Inc. ("BDP") and Logitrans International, LLC ("Logitrans") because Dimond's suit was not

timely filed within the one-year statute of limitations set forth in the Carriage of Goods by Sea Act ("COGSA").  We affirm the district court's judgment.

## I.  FACTUAL BACKGROUND

Dimond was hired by a Chinese auto manufacturer to "rig, dismantle, wash, and pack," and ultimately ship several tons of used automotive assembly-line equipment to China (the "Equipment").  Dimond lacked experience in international shipment.  *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 320 F. Supp. 3d 947, 948 (N.D. Ohio 2018).  Dimond alleged that it received an "unsolicited call" from BDP offering to "assume and perform . . . each and every aspect of the shipment." *Ibid.*  Dimond hired BDP to ship the Equipment.  Dimond asserted that BDP did not disclose that it was not a licensed Ocean Transport Intermediary ("OTI") by the Federal Maritime Commission.  *Ibid.*

In May 2011, BDP informed Dimond that it had obtained a ship and sent a booking note to Dimond that included proposed terms and conditions of the shipment.  At that time, the Equipment had not been completely dismantled and weighed.  *Id.* at 948–49.  Between May and October 2011, Dimond completed these tasks and prepared a "preliminary and estimated packing list" for BDP.  BDP allegedly provided the preliminary packing list when it obtained quotes from third-party contractors who would load the Equipment.  *Id.* at 949.

In October 2011, BDP notified Dimond that the first ship it had booked was no longer available.  Dimond asserted that BDP had "without Dimond's knowledge, consent or approval" hired Logitrans to "perform some, or all of BDP's freight forwarding duties including locating/booking or providing a ship; acting in the capacity as the NVOCC carrier for the shipment . . . and negotiating loading services . . . ."  Dimond alleged that BDP misrepresented that Logitrans was a Non-Vessel Operating Common Carrier[1] ("NVOCC").

BDP and Logitrans hired the *Gisele Scan*, operated by Scan-Trans, Inc. ("Scan-Trans"), to transport the Equipment from the Port of Cleveland to Xingang, China.  BDP prepared a new

---

[1]A non-vessel operating common carrier "consolidate[s] cargo from numerous shippers into larger groups for shipment by an ocean carrier."  *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000).  The NVOCC, rather than the ship that transports the cargo, "issues a bill of lading to each shipper."  *Ibid.*

Booking Note and Bill of Lading for the transportation of the Equipment aboard the *Gisele Scan*.[2]  *Dimond Rigging Co.*, 320 F. Supp. 3d at 949.  The Booking Note identified Dimond[3] as the Merchant,[4] Logitrans as the Carrier, Scan-Trans as the Agent-Shipbrokers, and BDP as the Merchant's Representative.  *Ibid.*

The Booking Note incorporated the Bill of Lading.  The following terms in the Bill of Lading are of particular relevance.

> (a) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 ("U.S. COGSA"), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.

The Bill of Lading also contained a "Himalaya Clause."[5]

> (a) It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this contract of carriage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.

---

[2]A bill of lading is a contract for the transportation of goods.  It "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004).

[3]The Bill of Lading lists "Absolute Rigging and Millwrights" as the Merchant.  Dimond appears in various cases as Dimond Rigging Company, LLC d/b/a Absolute Rigging and Millwrights.  *See Federal Marine Terminals, Inc. v. Dimond Rigging Co., LLC*, No. 1:13-cv-01329, 2014 WL 4809427 (N.D. Ohio Sept. 26, 2014).

[4]The Bill of Lading defines "Merchant" to include "the charterer, shipper, the receiver, the consignor, the consignee, the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo."

[5]A "Himalaya Clause" is a clause that imposes liability limitations.  *See Kirby*, 543 U.S. at 20 & n.2.  The name originates from an English case, *Adler v. Dickinson (The Himalaya)*, [1955] 1 Q.B. 158, [1954] 2 Lloyd's List L. Rep. 267, in which personal-injury claims were brought against the master and boatswain of the *Himalaya*.  The *Himalaya*'s owners had included "customary exculpatory clauses" protecting them from liability for negligent injury to passengers.  *See* Joseph C. Sweeney, *Crossing the Himalayas: Exculpatory Clauses in Global Transport*. Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd*., 125 S. Ct. 385, 2004 AMC 2705 (2004)*, 36 J. Mar. L. & Com. 155, 161 (2005).

(b) Without prejudice to the generality of the foregoing provisions in this Clause, every exemption from liability, limitation, condition and liberty herein contained and every right, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled, shall also be available and shall extend to protect every such servant and agent of the Carrier as aforesaid.

Both Logitrans and Dimond signed the Booking Note.

Dimond alleged that it was not informed about a pre-load inspection meeting and that Logitrans and BDP did not attend the meeting either. This, Dimond asserted, led to delays and increased costs, because the *Gisele Scan* was not able to take on all the Equipment, and the stevedores would not load all the Equipment because it was not included in their quote. *Dimond Rigging*, 320 F. Supp. 3d at 949–50. Ultimately, the *Gisele Scan* departed, leaving behind approximately 34 pieces of equipment. It arrived in China in March 2012.

As a result of these shipping difficulties, Dimond became involved in multiple lawsuits, including suits with its Chinese customer and the stevedores. *Id.* at 950. Dimond filed a Complaint against BDP in the Northern District of Ohio on July 11, 2013, alleging Breach of Fiduciary Duty, Unjust Enrichment, and Fraud. *Ibid.* Dimond never served BDP with the Complaint and, when the summons expired, the district court dismissed the Complaint without prejudice. *Ibid.* On August 9, 2017, Dimond filed a Motion to Amend and Praecipe for Issuance of Amended Summons for its 2013 suit against BDP. The district court denied the Motion. Dimond filed a five-count Complaint against BDP and Logitrans on October 2, 2017, asserting claims for: (1) breach of fiduciary duty; (2) fraudulent non-disclosure; (3) intentional fraud; (4) breach of agreement, failure to perform and illegality of contract; and (5) unjust enrichment.

## II.  PROCEDURAL HISTORY

BDP filed a Motion to Dismiss, asserting that Dimond had failed to state a claim upon which relief could be granted because the statute of limitations on Dimond's claims had run. Logitrans was served on November 27, 2017. Logitrans's president sent Dimond's counsel a letter on December 19, 2017, denying liability and responding to Dimond's complaint. Logitrans did not file a copy of the letter with the court. Dimond filed a Request for an Entry of Default pursuant to Fed. R. Civ. P. 55(a) on December 29, 2017. Logitrans retained counsel and filed a

Memorandum opposing Dimond's Request on January 3, 2018. The district court denied Dimond's Request for Entry of Default and ordered Logitrans to file an amended answer. Logitrans then filed a Motion to Dismiss, asserting the same defense that BDP used—that the statute of limitations had run.

The district court granted the Motions to Dismiss. It explained that, because bills of lading are "maritime contracts, governed by federal maritime law[,]" COGSA governed Dimond's claims. *Dimond Rigging*, 320 F. Supp. 3d at 952–53. Because COGSA has a one-year statute of limitations for cargo claims in contract or tort that begins to run after the goods have been delivered, or on the date the goods should have been delivered, the district court concluded that Dimond should have filed its claims in May 2013, one year after the goods were released to Dimond's customer. Because it did not, the district court concluded that Dimond's claims were outside the statute of limitations. *Id.* at 953. In reaching this conclusion, the district court substantially relied on *Federal Marine Terminals, Inc. v. Dimond Rigging Co., LLC*, No. 1:13-cv-01329, 2014 WL 4809427 (N.D. Ohio Sept. 26, 2014), a related case in which the same district court (albeit by a different judge) had already determined that, through the Bill of Lading, COGSA governed the shipment of the Equipment, and the Himalaya Clause extended COGSA to independent contractors. *Dimond Rigging*, 320 F. Supp. 3d at 950. The district court also rejected Dimond's arguments that BDP and Logitrans should be estopped from benefiting from COGSA's one-year statute of limitations because they allegedly did not comply with certain licensing requirements. The district court explained that, because COGSA does not include licensure requirements, Dimond failed to sufficiently allege that BDP and Logitrans were in violation of COGSA. *Id.* at 953–54.

Dimond appealed the district court's order granting the Motions to Dismiss. It also asserts that the district court should have entered a default against Logitrans.

## III. ANALYSIS

### A. Standard of Review

We review a district court's dismissal of claims pursuant to Fed. R. Civ. P. 12(b)(6) de novo. *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 451 (6th Cir. 2003). In reviewing the

motion, the court accepts all factual allegations in the complaint as true, construed in the light most favorable to the plaintiff. *See Hall v. Callahan*, 727 F.3d 450, 453 (6th Cir. 2013). "Dismissal of a complaint because it is barred by the statute of limitations is proper when 'the statement of the claim affirmatively shows that the plaintiff can prove *no* set of facts that would entitle him to relief.'" *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 946 (6th Cir. 2002) (emphasis in original) (quoting *Duncan v. Leeds*, 742 F.2d 989, 991 (6th Cir. 1984)).

## B. COGSA

The primary issues in this case are whether COGSA controls, and whether BDP and Logitrans are "carriers" within the meaning of COGSA. If so, then Dimond should have filed its claim within one year after delivery, or the date when the goods should have been delivered.[6] *See* 46 U.S.C. § 30701 (Notes § 3(6)). The Equipment arrived in China on March 21, 2012 and was released to Dimond's customer on May 17, 2012. *Dimond Rigging*, 320 F. Supp. 3d at 953. Accordingly, if COGSA applies, Dimond should have filed its claims against BDP and Logitrans by May 17, 2013, *ibid.*; 46 U.S.C. § 30701 (Notes § 3(6)), and the district court correctly granted Appellees' Motions to Dismiss.

### 1. Does COGSA Control the Bill of Lading?

Dimond argues that this is not a maritime dispute, but instead is about "breaches of contractual agreements, breaches of fiduciary duties, and outright fraud," which do not create maritime jurisdiction. In determining whether this is a maritime dispute, the "answer 'depends upon . . . the nature and character of the contract' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (quoting *North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). This case arises from a contract to transport used manufacturing equipment by sea from the United States to China. It is plainly a maritime transaction.

---

[6]Dimond argues that it "was not a party to the contract of carriage with the ship/carrier directly, or via any authorized agent . . . ." The district court rejected this argument because Dimond is listed as a party on the bill of lading. *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 320 F. Supp. 3d 947, 952 n.1 (N.D. Ohio 2018). Dimond *signed* the Bill of Lading. We agree with the district court.

Dimond's argument is without basis. "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Id.* at 22–23.

Dimond points out that the Bill of Lading and Rider contain multiple choice-of-law options, including Hague-Visby,[7] COGSA, and English law. Dimond does not, however, argue that we should apply Hague-Visby or English law, or submit the matter to arbitration in London. Instead, Dimond suggests that these options render the Bill of Lading ambiguous and unenforceable.[8] Dimond maintains that the true reason COGSA does not apply is because BDP and Logitrans were not in compliance with federal statutes and regulations concerning shipping, and therefore the court should apply Ohio law to assess whether Dimond's claims were timely filed. BDP and Logitrans argue that the Bill of Lading, coupled with Dimond's allegations, demonstrate that COGSA does apply, and urge us to affirm the district court's ruling. Even assuming that COGSA does not apply, BDP and Logitrans maintain that Dimond's claims are not timely under the applicable state statutes of limitations.

COGSA applies "to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." 46 U.S.C. § 30701 (Notes § 13); *see Fortis Corp. Ins., S.A. v. Viken Ship Mgmt. AS*, 597 F.3d 784, 787 (6th Cir. 2010). "[E]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea from ports of the United States, in foreign trade, shall contain a statement that it shall have effect subject to the provisions of this [Act]." 46 U.S.C. § 30701 (Notes § 13).

United States courts must apply COGSA if the statute so requires. *See Acciai Speciali Terni USA v. M/V BERANE*, 182 F. Supp. 2d 503, 506 (D. Md. 2002) ("United States courts

---

[7]Hague-Visby refers to the 1924 International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, which was subsequently modified by the Hague-Visby Amendments of 1968. *See Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 413 (6th Cir. 2008).

[8]Dimond also suggests that an amended bill of lading, issued when the *Gisele Scan* stopped in Denmark, that covers the remainder of the shipment from Denmark to China supersedes the Bill of Lading. We considered a related question in *Royal Ins. Co.*, 525 F.3d at 418–20. There we held that an "intermediary stop" pursuant to a maritime contract that uses multiple modes of transportation with an ultimate destination in the United States does not "prevent the application of COGSA liability rules as a matter of federal common law." *Id.* at 420. Under *Royal Ins. Co.*, we conclude that the stop in Denmark, even one that resulted in an amended Bill of Lading (Dimond asserts that this was due to damage to the cargo from a storm), does not bar the application of COGSA because this is a contract for carriage of goods by sea *from* a port of the United States. *See* 46 U.S.C. § 30701 (Notes § 13). Further, the Denmark Bill of Lading includes an identical COGSA clause to the original Bill of Lading.

must apply COGSA, when its terms so require, regardless [of] where bills of lading were issued or whence carriage began."); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 128 (S.D.N.Y. 1997) ("Courts must apply COGSA, when its terms so require, no matter where the bill of lading was issued."). By the statute's own terms, COGSA applies to contracts of carriage[9] of goods to or from United States ports in foreign trade. *See* 46 U.S.C. § 30701 (Notes § 13) ("[COGSA] shall apply to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade."); *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 416 (6th Cir. 2008) (listing cases). Because the Bill of Lading is a contract to transport goods in foreign trade from a United States port (Cleveland) to a foreign port (China), COGSA applies.[10]

## 2. Are BDP and Logitrans Carriers?

The question remains whether BDP and Logitrans are "carriers" within the meaning of COGSA, and so may fairly invoke its one-year statute of limitations. The Bill of Lading lists Logitrans as the carrier. Dimond acknowledges this, then reiterates that COGSA cannot apply

---

[9]Under COGSA:

> The term "contract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

46 U.S.C. § 30701 (Notes § 1(b)).

[10]Dimond asserts that we must attempt to "determine what law—maritime or state or federal common law—governs the various stages of sea and overland portions of the intermodal transport." The district court concluded that Dimond made separate arrangements to transport the Equipment from its plant to Cleveland, and that the Chinese customer was responsible for transport from the port of arrival, Xingang, to wherever it needed to go. *See Dimond Rigging Co.*, 320 F. Supp. 3d at 952–53. Dimond's Complaint asserts that it hired BDP to handle shipping the Equipment to China. Dimond's brief states that it moved the Equipment to Cleveland by truck and rail and notified BDP that it was doing so.

Even if Dimond were to have made arrangements with BDP to cover the overland transportation, we observe that in *Kirby*, 543 U.S. at 27, the Supreme Court resolved the question of how federal courts must determine whether a contract for maritime and land transport is a maritime contract. The Court explained that "so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract." *Ibid.* Even if it provides for *some* overland transport, it is still a maritime contract as long as the case is not inherently local. *Ibid.* The Bill of Lading requires transport from the port of Cleveland to Xingang. It does not refer to any other ground transportation. We have already concluded that, contrary to Dimond's assertions, this is obviously a maritime dispute.

because it was a non-party to the contract (that it signed) and BDP and Logitrans "are not agents of the vessel or the carrier." Dimond asserts that this is not a suit "between Dimond and the actual carrier," the *Gisele Scan*, but "between Dimond and two companies that represented themselves as licensed carriers." Dimond insists that because Logitrans and BDP are not in compliance with various maritime licensing statutes and regulations, they cannot be carriers.[11]

BDP argues that because Dimond characterized it as a carrier, freight forwarder, or NVOCC in the Complaint, assuming all allegations are true, it is covered by the COGSA statute of limitations. BDP asserts that COGSA applies "even where a party's role is uncertain, based on how the parties to a contract of carriage represent themselves or are viewed by the other parties to the contract." The cases BDP cites for this proposition are not authoritative: one is unpublished, and all are from district courts that are not within this circuit. Logitrans maintains that because it was the Carrier on the Bill of Lading, and based on its role, it was a "carrier" within the meaning of COGSA. Both BDP and Logitrans assert that, in any event, the statute of limitations applies through the Himalaya Clause.

The district court observed that *Federal Marine Terminals*, 2014 WL 4809427, at *3, had found that the Bill of Lading's Himalaya Clause included contractors who were not even listed on the Bill of Lading. *Dimond Rigging*, 320 F. Supp. 3d at 953. Applying this reasoning, the district court concluded that, "regardless of their specific roles in the transaction," both Logitrans and BDP were subject to COGSA. *Ibid.* It did not make any findings regarding whether BDP and Logitrans were "carriers." *Ibid.* The problem with this approach is that it ignored the fact that COGSA's one-year statute of limitations does not apply to *every* party in the transaction. Specifically: "[T]he *carrier and the ship* shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered[.]" 46 U.S.C. § 30701 (Notes § 3(6)) (emphasis added). Parties may extend COGSA by "adding provisions to bills of lading extending the COGSA

---

[11]Dimond insists that "the carrier clearly states that Dimond is NOT and was not the shipper in this case." It supports this proposition by citing the Denmark Bill of Lading, which expressly identifies Dimond (there d/b/a as Absolute Rigging and Millwrights, *see supra* note 3), as the shipper. The other Bill of Lading, which identifies Dimond as the "Merchant," states that that term includes shippers. *See supra* note 4. We fail to understand how Dimond can squarely make this argument in light of the evidence it cites.

regime to any and all agents or independent contractors who participate in the shipment of goods under a particular contract." *Fortis Corp.*, 597 F.3d at 792 (citing *Kirby*, 543 U.S. at 30–31). In other words, COGSA permits the use of Himalaya Clauses to limit parties' liability. *Ibid.* But merely because a Bill of Lading contains a Himalaya Clause does not mean that the Clause covers *every* entity or individual involved in a transaction.

We first consider whether Logitrans and BDP are carriers within the meaning of COGSA. *See Sabah Shipyard v. M/V Harbel Tapper*, 178 F.3d 400, 404 (5th Cir. 1999) (explaining that COGSA liability limits only apply to carriers); *Shonac Corp. v. Maersk, Inc.*, 159 F. Supp. 2d 1020, 1025 (S.D. Ohio 2001) (discussing carriers). A "carrier" under COGSA means "the owner, manager, charterer, agent, or master of a vessel." 46 U.S.C. § 30701; *see also id.* (Notes § 1(a)) ("The term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper."). "COGSA provides that 'carriers' are subject to certain statutory 'responsibilities and liabilities,' and in turn they are provided with certain 'rights and immunities,' such as [a] one-year statute of limitations . . . ." *Fortis Corp.*, 597 F.3d at 787. An NVOCC, as noted, *supra*, consolidates cargo from various shippers and issues a bill of lading. *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000) (explaining that NVOCCs are carriers under COGSA). A freight forwarder[12] "facilitates the movement of cargo to the ocean vessel." *Ibid.* "Freight forwarders generally make arrangements for the movement of cargo at the request of clients . . . . a freight forwarder does *not* issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped." *Ibid.* (emphasis in original) (citing *United States v. Am. Union Trans.*, 327 U.S. 437, 442–43 (1946)).

In *Fortis Corp.*, 597 F.3d at 789, we considered whether a ship's manager was a carrier under COGSA. We focused on the plain language of COGSA in concluding that the manager was not a carrier. *Id.* at 789–92. *See also Shonac Corp.*, 159 F. Supp. 2d at 1026 (discussing the "plain language" approach for assessing whether a party is a carrier). Under this approach, a

---

[12]BDP asserts in its brief that it "was and is a licensed NVOCC." The record contains a copy of BDP's Ocean Transportation Intermediary ("OTI") License. The License states that BDP is authorized to provide freight-forwarding services.

court considers whether a party satisfies the statutory definition.**13** *See Sabah Shipyard*, 178 F.3d at 405. This is an assessment of *function*, rather than *form*. *Prima U.S. Inc.*, 223 F.3d at 130 n.1 (explaining that a party calling itself a freight forwarder that performed carrier functions would be a carrier). The key inquiry is what the party did. If it issued a bill of lading, then it is usually a "carrier" under COGSA. *See id.* at 129; *Sabah Shipyard*, 178 F.3d at 405; *Shonac Corp.*, 159 F. Supp. 2d at 1026. It is not dispositive that the party hired a third party to actually carry the goods. *See Sabah Shipyard*, 178 F.3d at 405; *Shonac Corp.*, 159 F. Supp. 2d at 1026.

We turn to the Complaint and the Bill of Lading. Because this is an appeal from a Motion to Dismiss, we must construe Dimond's factual allegations as true. *See Hall*, 727 F.3d at 453. Dimond alleged that BDP represented that BDP would handle all aspects of the shipment including, *inter alia*, providing a ship, dispatching the shipments, handling export documents, and preparing bills of lading. Dimond asserted that BDP had "subcontracted its shipping/freight forwarding services/obligations" to Logitrans. BDP apparently obtained one ship for Dimond and provided a booking note, but the first ship became unavailable. BDP also allegedly made all the arrangements for the stevedores to load the ship. Dimond alleges that after the original ship was no longer available, BDP notified it that Logitrans would be involved in shipping the Equipment, and that BDP and Logitrans ultimately selected the *Gisele Scan*. BDP issued the Bill of Lading, which identified Logitrans as the "carrier" to Dimond.

Assuming Dimond's allegations about Appellees' roles are true, BDP appears to have engaged in some freight-forwarding services, such as securing the ship, handling export documents, and making arrangements for stevedores to load the Equipment. *See Prima U.S. Inc.*, 223 F.3d at 129. BDP was not responsible for transporting the Equipment to the Port of Cleveland—Dimond asserts that it handled that. BDP, however, issued the Bill of Lading, which is a service provided by a carrier. *Ibid.*; *Sabah Shipyard*, 178 F.3d at 405; *Shonac Corp.*, 159 F.

---

**13**In *Shonac Corp. v. Maersk, Inc.*, 159 F. Supp. 2d 1020, 1026 (S.D. Ohio 2001), the district court identified a second approach, set forth in *Zima Corp. v. M.V. Roman Pazinski*, 493 F. Supp. 268, 273 (S.D.N.Y. 1980). Under this approach, a party may be determined to be a carrier through a four-factor test: (1) how the party's obligation is expressed in documents pertaining to the agreement; (2) the history of dealings between the parties; (3) whether the party issued a bill of lading; and (4) how the party charged the shipper. *Ibid.*; *see also Sabah Shipyard v. M/V Harbel Tapper*, 178 F.3d 400, 405 n.2 (5th Cir. 1999). In *Fortis Corp. Ins., S.A. v. Viken Ship Mgmt. AS*, 597 F.3d 784, 789 (6th Cir. 2010), we focused on the language of the statute instead of a multi-factor test.

Supp. 2d at 1026.  Logitrans was also involved in securing the ship.  It is listed as the "carrier" on the Bill of Lading.  Dimond also refers to Logitrans as the "carrier" in its briefs.

*Sabah Shipyard* is illustrative in resolving whether BDP and Logitrans are "carriers" under COGSA.  In that case, Sabah had to ship some equipment to Malaysia.  178 F.3d at 403.  IMB won the bid to transport the equipment.  IMB's agent, Intermarine, issued a bill of lading.  After some of the equipment slid into the Singapore harbor, Sabah filed suit seeking damages under COGSA.  The district court found that the defendants were liable for negligence but did not apply a COGSA limit on liability because it held that IMB and Intermarine were forwarders, not carriers.  *Ibid.*  The Fifth Circuit concluded that the district court erred when it determined that IMB and Intermarine were not carriers within the meaning of COGSA.  *Id.* at 406.  The Fifth Circuit explained that "[t]o determine whether a party is a COGSA carrier, we have followed COGSA's plain language, focusing on whether the party entered into a contract of carriage with a shipper."  *Id.* at 405.  Because IMB and Intermarine entered into a contract of carriage— namely, they "agreed to carry Sabah's goods by sea, and they issued a bill of lading[,]" they were carriers.  *Ibid.*

BDP entered into a contract of carriage with Dimond because it took on the responsibility of transporting the Equipment by sea.  BDP issued the Bill of Lading.  *Dimond Rigging*, 320 F. Supp. 3d at 949.  BDP is a carrier.  *See Sabah Shipyard*, 178 F.3d at 405; *Bunge Edible Oil Corp. v. M/Vs Torm Rask & Fort Steele*, 949 F.2d 786, 788–89 (5th Cir. 1992) (explaining that charterer of vessel who enters into contract of carriage with shipper is a carrier); *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1370 (5th Cir. 1979) (concluding that party that entered into a contract of carriage covered by a bill of lading is a carrier within COGSA's definition).  Logitrans also entered into a contract of carriage with Dimond.  It signed the Bill of Lading and is identified as the "carrier."  Accordingly, Logitrans is also a carrier.  *See Bunge Edible Oil Corp.*, 949 F.2d at 788; *Nitram, Inc.*, 599 F.2d at 1370.  Because we conclude that BDP and Logitrans are "carriers" within the meaning of COGSA, there is no need to address the Himalaya Clause.

Dimond argues that equitable estoppel should bar BDP and Logitrans from benefiting from COGSA's one-year statute of limitations because BDP and Logitrans were not in

compliance with COGSA.  Dimond maintains that we should apply equitable estoppel to "refuse to validate Defendant's wrongful conduct in this case through a Motion to Dismiss on limitations grounds arising from a statute with which they did not comply."  Dimond offers a list of various federal shipping laws and regulations that it asserts BDP and Logitrans have violated and argues that because they misrepresented their status as licensed entities, they should not be allowed to use COGSA as a defense.  Dimond has not identified *any* portion of COGSA that the Appellees have allegedly not complied with.

The district court ruled that there was no basis to apply equitable estoppel because COGSA does not include licensure provisions.  *Dimond Rigging*, 320 F. Supp. 3d at 953–54.  To be sure, COGSA does not supersede rights and obligations set forth in other federal statutes.  *See* 46 U.S.C. § 30701 (Notes §§ 8, 12).  COGSA establishes "particularized duties and obligations upon, and grants stated immunities" to carriers.  *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301 (1959).  We explained in *Fortis Corp.*, 597 F.3d at 789, that COGSA "was drafted to address the belief that carriers used their superior bargaining power against shippers when contracting for the carriage of goods, and could often dictate the terms of bills of lading to exempt themselves from any liability."  Nonetheless, the district court was quite correct that COGSA does not concern itself with licensing.

Dimond's complaint does not allege that BDP and Logitrans represented that they were in compliance with COGSA.  For Dimond to estop BDP and Logitrans from using COGSA as a defense, it would have to show that it detrimentally relied on such representations.  *See Thomas v. Miller*, 489 F.3d 293, 302 (2007) (setting out elements of equitable estoppel); *see also Oxford Shipping Co., Ltd. v. N.H. Trading Corp.*, 697 F.2d 1, 3–4 (1st Cir. 1982) (equitable estoppel claim under COGSA).  It has not done so.

Dimond also maintains that the Bill of Lading is an illegal contract because, as unlicensed entities, BDP and Logitrans could not issue an enforceable Bill of Lading, although Dimond suggests that BDP might be a licensed freight forwarder.  BDP and Logitrans dispute the accuracy of Dimond's licensing arguments.  BDP asserts that the record below shows that it has been a licensed Ocean Transport Intermediary under the Federal Maritime Commission

("FMC") since 1999.**14** Logitrans maintains that it is not required to have a license because it is a "vessel/cargo/charter broker." Appellees also insist that licensure is irrelevant to the application of COGSA and the lack of a license does not void a contract. As noted above, the district court only ruled that COGSA does not contain licensing requirements. It did not take judicial notice of BDP's license or make any findings on that issue.

Dimond points to FMC regulations concerning licensing, particularly 46 C.F.R. § 515.3, which provides: "Except as otherwise provided in this part, no person in the United States may act as an ocean transport intermediary unless that person holds a valid license issued by the Commission." Dimond insists that FMC regulations, specifically *id.* § 515.2(h)(5) and (k)(4), prohibit an unlicensed person (Logitrans) or a licensed freight-forwarder (BDP) from issuing a legally-enforceable bill of lading. Subsection (h) in that regulation defines "[f]reight forwarding services," which "refers to the dispatching of shipments on behalf of others" to facilitate shipments by a common carrier, "which may include, but are not limited to . . . [p]reparing and/or processing common carrier bills of lading or other shipping documents." *Id.* § 515.2(h)(5). Subsection (k)(4) states that NVOCC services "may include . . . [i]ssuing bills of lading or other shipping documents." *Id.* (k)(4). This definitional regulation may identify what certain services within the regulations *are* or *include*, but it does not contain any language establishing, as Dimond argues, that BDP could not issue a legally-enforceable bill of lading.

Assuming, for the sake of argument, that an unlicensed entity issued the Bill of Lading, we briefly consider whether an unlicensed entity may make a valid contract. The parties dispute whether *Adams Express Co. v. Darden*, 286 F. 61 (6th Cir. 1923), supports the argument that an unlicensed entity may create a valid and enforceable contact. In *Adams Express*, the shipper arranged for a carrier to transport six horses. In violation of the Interstate Commerce Act, the carrier misrepresented the horses' value to pay lower tariff rates. *Id.* at 62–63. The carrier was negligent and the car containing the horses wrecked, killing five horses. The shipper sued and was awarded the value of the horses. The carrier appealed, arguing that because it had violated the Act, the shipping contract was void. *Id.* at 63. We explained that whether the contract was void and unenforceable depended on the public policy of the United States. *Id.* at 65. The

---

**14**Dimond argues that BDP only obtained a license in 2013, *after* the events at issue.

statute penalized the carrier's practices (and would have penalized the shipper as well), but it "never declared the contract of carriage unenforceable . . . ." *Ibid.* We offered the following analysis: "[W]hen a statute imposes specific penalties for its violation, where the act is not malum in se, and the purpose of the statute can be accomplished without declaring contracts in violation thereof illegal, the inference is that it was not the legislative intent to render such contracts illegal and unenforceable." *Ibid.* Applying this principle, we concluded that "Congress presumably believed" that it was better to permit suit to hold a carrier liable for the value of the items destroyed by its negligence, even if the carrier had violated the Act and was subject to the penalties. *Ibid.*

Dimond argues that *Adams Express* cannot apply because there are no penalties in the Shipping Act for operating without a license and operating without a license is malum in se.[15] As to the first point, whatever the Act may say, FMC regulations pursuant to the Act do, in fact, impose civil penalties for operating without a license. *See* 46 C.F.R. § 515.1(b) (civil penalty that does not exceed $9,000 per violation, unless said violation was knowing or willful, in which case penalty may not exceed $45,000 per violation). Dimond's insistence that *only* licensed entities may operate is further undermined by FMC regulations that permit operations without a license. *See, e.g.*, *id.* § 515.4(c) (common carriers or their agents may perform freight-forwarding services without a license with respect to cargo carried under carrier's own bill of lading).

The FMC regulatory scheme surrounding licensing emphasizes experience and character, but also financial dependability, and compliance with other federal statutes and regulations. *See id.* § 515.11. The bond requirements ensure that claims against an OTI may be adequately compensated in the event that a complaint is filed with the FMC—although this is *not* the sole remedy. *See id.* § 515.23. It does not appear that the purpose of these regulations may only be accomplished by voiding a bill of lading issued by an unlicensed party in violation of the

---

[15]Operating without a license is an act that is purely prohibited by statute, rather than inherently wrong in and of itself. *Compare malum in se*, Black's Law Dictionary (8th ed. 2004) ("A crime or act that is inherently immoral, such as murder, arson, or rape."), *with malum prohibitum*, *id.* ("An act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral.").

regulations.  As Dimond has not offered *any* authority within the Shipping Act or its regulations that states that such a bill of lading is unenforceable, we reject these arguments.

The Bill of Lading is a contract of carriage, subject to COGSA.  BDP and Logitrans are carriers as the term is defined in COGSA.  We reject Dimond's arguments that the Appellees should be estopped from using the one-year statute of limitations as a defense, and that BDP could not issue a legally enforceable Bill of Lading.  Accordingly, we do not need to address whether state statutes of limitations would bar Dimond's action even if COGSA did not apply.  The district court did not err in concluding that COGSA's one-year statute of limitations barred Dimond's suits.

## C.  Default

Dimond asserts that the district court should have entered a default against Logitrans because it did not answer Dimond's Complaint.  Within the time permitted to respond, Logitrans's President sent Dimond a letter that answered the gist of the Complaint.  Logitrans, however, failed to file any responsive pleading with the court.  After Dimond asked the district court to enter a default on December 29, 2017, Logitrans filed a memorandum opposing the entry of default on January 3, 2018.  The district court denied Dimond's request for default and ordered Logitrans to file an amended answer by January 16.  Logitrans filed its motion to dismiss by the deadline.

An order that denies a motion for a default is not immediately appealable.  *McNutt v. Cardox Corp.*, 329 F.2d 107, 108 (6th Cir. 1964).  Dimond appealed from the final judgment of the district court, which would include all prior interlocutory orders and rulings that were not reviewable until the final judgment.  *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) ("[A]n appeal from a final judgment generally brings up all prior interlocutory orders and rulings that were not reviewable until the entry of a final judgment.").  The district court dismissed Dimond's case, and therefore the denial of the motion of default is reviewable along with the order of dismissal.  Because Dimond has appealed from the entry of a final judgment, the court has jurisdiction over this issue on appeal.  *Ibid.*

Logitrans argues that Dimond has waived this issue on appeal because it did not identify this issue in the "issues presented for review" section of its brief.**16**  Federal Rule of Appellate Procedure 28(a)(5) states that the appellant's brief "*must* contain . . . a statement of the issues presented for review . . . ." (Emphasis added).  Applying this rule, we have concluded that when an appellant does not comply by listing *all* the issues presented for review in the statement of issues, the appellant waives that argument.  *See United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016); *United States v. Honeycutt*, 816 F.3d 362, 370 (6th Cir. 2016), *rev'd on other grounds by* 137 S. Ct. 1626 (2017); *Barrett v. Detroit Heading, LLC*, 311 F. App'x 779, 796 (6th Cir. 2009).  Because Dimond did not include its claim that the district court should have granted it a default against Logitrans in its statement of issues, it is waived.

The judgment of the district court is AFFIRMED.

---

**16**Dimond offers no response to this argument in its Reply Brief.